**Robert C. MAGEE, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–97–065–CR.**

Court of Appeals of Texas, Waco.

June 9, 1999.

committed in jury selection, and that the deadly weapon finding should be deleted. Finding a single error that did no harm, we will affirm the judgment.

## SUMMARY

Robert and Crystal Magee lived in the Ridgegate Apartments in Dallas with their two small children.[1] On the afternoon of August 28, 1995, Crystal ran out of her apartment and into the apartment next door. She was badly burned with smoke coming from her body. She told several individuals at the scene and later at the hospital that her husband had poured gasoline on her and set her on fire. Crystal, who was severely burned over 95% of her body, died that night. Magee was burned on his hands and face. He testified that he and Crystal were in the process of divorcing, that Crystal had poured gasoline on herself, and that the gasoline had somehow ignited while she was alone in the bathroom.

## THE EVIDENCE

Because Magee brings both legal and factual sufficiency issues, we will briefly summarize the testimony:

### STATE'S WITNESSES

*Robin Turner*

Robin Turner, the Magees' next door neighbor, testified that she heard a woman screaming outside her apartment at approximately noon. Her boyfriend went outside and returned, telling Turner to call 9-1-1. Crystal then ran into Turner's apartment. Her hands and body were burned and smoking. Crystal yelled, "I'm burning, I'm burning. I can't believe he did this ... He poured it on me and he set me afire." Crystal further stated, "I didn't believe that he would do it. But he did it. He threw it on me and lit it."

John H. Hagler, Dallas, for appellant.

John C. Vance, Criminal Dist. Atty., Sue Korioth, Wendy Koster, Asst. Dist. Attys., Dallas, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

VANCE, Justice.

A jury convicted Robert C. Magee, Jr. ("Magee") of murdering his wife, Crystal Magee ("Crystal"), by setting her on fire. *See* TEX. PEN.CODE ANN. § 19.02 (Vernon 1994). The jury sentenced him to life imprisonment and affirmatively found that he had used a deadly weapon, *i.e.* gasoline, in the commission of the offense. Magee appeals on six issues. He alleges that the evidence is legally and factually insufficient, that the court erred in admitting certain evidence, that *Batson* error was

---

1. The Magees had one daughter, Jasmine. Crystal had a son, Chris, from a prior relationship. Magee testified that he considered both children to be his. Magee's younger sister and brother were also living in the apartment.

Turner asked who had done this, and Crystal said it was her husband.

Turner stated that Crystal was screaming about her children. She told Crystal to lie down on the floor, then went into the breezeway and saw Magee coming out of his apartment. His hands were burned. Magee asked Turner if she had called for an ambulance, and she told him she had.

### Carlos Wallace

Carlos Wallace testified that between 12:30 and 1 p.m. he heard someone yelling, "Help me, please help me," and saw a woman running into an apartment. Wallace followed the woman into the apartment. He saw Crystal lying on the floor, yelling about her children. Wallace asked Crystal where the children were and someone responded that they were next door. Wallace ran into the apartment next door where he saw a young boy and girl on the floor. He took one of the children outside. When he reentered to get the other child, he encountered Magee. Wallace asked Magee what was going on, but Magee did not answer. Wallace took the second child outside and reentered to tell Magee to get out. Magee had burns on his face, hands, and arms.

Wallace returned to Turner's apartment and tried to assist Crystal. She said to him, "[H]e poured gas on me . . . he tried to hurt me, he tried to kill me." Wallace stated that Crystal did not mention that Magee had actually lit the fire.

### Phillip Minchew

Phillip Minchew, a firefighter-paramedic, testified that he was dispatched to the Ridgegate Apartments around 1 p.m. He found Crystal lying in the floor, and she told him, "[M]y husband threw gasoline on me then he lit it. . . . [H]e . . . tried to put me out and said he was sorry." Minchew stated that Crystal's body was so badly burned that he was unable to establish an IV. Crystal was taken by helicopter to

Parkland Hospital. Magee was also taken to Parkland.

### Dr. Gary Purdue

Dr. Gary Purdue, a surgeon and co-director of the Parkland Hospital burn unit, testified that Crystal was admitted into the emergency room with third-degree burns over 95% of her body.[2] Purdue stated that he was responsible for evaluating Crystal, and he determined that, because they were so deep, "there was no way she could survive these burns." Purdue determined that Crystal's condition was terminal and that the choices were to perform painful medical procedures or to simply do nothing and make her as comfortable as possible. Purdue spoke with Crystal and determined that she was alert and oriented. He told her that "these burns were going to kill her." He discussed the treatment options, and Crystal chose to have enough morphine to be made comfortable. Purdue completed a "do not resuscitate" order.

Purdue then asked Crystal how she had been burned. Crystal told him that "her husband had thrown gasoline on her and ignited it." Purdue stated that the "extreme depth" of the burns were consistent with gasoline burns and that he could smell gasoline in Crystal's hair. Crystal was transferred from the emergency room to the intensive care burn unit and given intravenous morphine. She died around 8 p.m., six to seven hours after she had been admitted.

Purdue testified that he also treated Magee, who had burns on about 20% of his body, including his hands, arms, and face. Magee required a breathing tube and an operation. He was kept in the hospital for approximately 20 days.

### Andrew Klein

Andrew Klein, a Dallas police officer, rode with Crystal in the helicopter to the hospital and talked with her in the hospital trauma room. He described Crystal's ap-

---

**2.** Purdue later testified more specifically about the severity of Crystal's burns—details so gruesome that we will not set them out in the opinion.

pearance: "I saw a very charred—the skin was peeling off this person. She was burned so badly, it looked like she had been put in a deep frying pan. Excuse me, it's a little difficult. I've never seen anybody like that before in my life." Klein asked Crystal what had happened, and she responded that "her husband had poured gasoline on her while she was laying down and lit her on fire." She said she did not know why Magee had done it.

### David Cawthorne

David Cawthorne, a captain with the Dallas Fire Department investigative division, was called to the Magees' apartment around 1 p.m. He said that the fire was localized on the bed in the master bedroom. Cawthorne found a gas container with a flammable liquid in the bathroom. The liquid had the odor of gasoline, but was not tested. He did not attempt to take fingerprints from the container.

### Dr. Jeffrey Barnard

Dr. Jeffrey Barnard, the medical examiner who performed the autopsy on Crystal's body, testified that there were burns on 95% of the body. He stated that the cause of death was "thermal burns" and that the manner of death was homicide. Barnard testified that gasoline, if ignited, is capable of causing serious bodily injury and death.

### DEFENSE WITNESSES

### Parchilla Herrod

Parchilla Herrod, property manager of the Ridgegate Apartments, testified that she was working in her office when a woman ran in screaming "there's a lady on fire." Herrod called 9–1–1 and went to the Magees' apartment. She then went to Turner's apartment where she saw Crystal lying in the floor. Herrod knelt down and stayed with Crystal until the paramedics arrived. She testified that Crystal did not say anything during that time because she was in too much pain.

### Tamika Magee

Tamika Magee, Magee's seventeen-year-old sister, testified that she and her younger brother Richard were living in the Magees' apartment at the time of the fire. She testified that the Magees were an average couple and that she had never seen any violence between them. Tamika stated that a police officer picked her up from school and took her to the hospital where she spoke with Crystal. Crystal did not say what had happened to her, but said that "she loved us and she didn't want us to be mad at her." Tamika testified that Crystal and Magee had spoken of divorce two weeks before the fire, that Crystal loved Magee, and that Crystal did not want the divorce.

### Richard Magee

Richard Magee, Magee's thirteen-year-old brother, was taken to the hospital by police. Richard testified that Crystal told him "that she was sorry what she did to my brother . . . It all started as a big joke but it went too far." He did not know what she meant by her statement and did not think she was dying. He stated that Crystal "seemed like she was okay. She seemed like she wasn't hurting as bad."

### Ola Ann Graves

Ola Ann Graves, Magee's grandmother, testified that she went to the Magees' apartment approximately two weeks after the fire. In the bathroom she saw a "crock pot" and some curling irons still plugged in. Graves also saw a pistol, a shotgun, and assorted shells lying around. Graves testified that Magee and Crystal "got along" well and that she had never seen any physical confrontations between the two.

### Robert C. Magee, Jr.

Magee testified that he and Crystal married in June 1992 and that he was discharged from the Navy in December 1993. He and Crystal lived for a short time in Orange, Texas, where Crystal's family lived. They moved to Dallas in

August 1994, and he worked as a porter at the Ridgegate Apartments.

Approximately two weeks before the fire, Magee told Crystal that he thought they should separate and get a divorce. He told her that "it would be best for her to go home until we make up our minds and make that final decision that we needed to be apart." Crystal and her children left for a family wedding in Orange. Magee started a new job on the evening of August 27. He returned to the apartment the following morning and found Crystal, her mother, and her aunt asleep in the house. Magee did not speak with Crystal or her relatives. He spoke with Tamika and Richard, and then he left the apartment to go get breakfast.

Magee testified that he returned to the apartment as Richard was leaving for school. He ate breakfast and went into the bedroom where Crystal was sleeping on the bed. He lay down on a foam mattress. Some time later that morning, Crystal woke him and asked how she was going to get to work. Magee testified that they got into a "heated discussion in regards to her being there," and he told her "that she was going to have to leave my household." Crystal "stormed" out of the bedroom, and Magee went back to sleep.

He awoke when Crystal reentered the bedroom carrying a red gas can. He jumped from the bed and tried to grab the can. Magee testified that this "wasn't the first time Crystal had pulled these pranks. Crystal had problems before. I tried to address them with her family." In the process of struggling over the can, he and Crystal got gasoline on themselves. Crystal left with the gas can, going into the bathroom and closing the door. Magee testified that he heard Crystal screaming. He ran to the bathroom where he saw the mid-portion of her dress on fire. He turned on the shower and pushed her into the shower trying to put out the fire. The shower, however, would not stay on and every time he pulled the lever for the

shower "it would pop back out." Crystal ran into the bedroom and jumped on the bed, where Magee tried to put out the fire with the bedspread. They both fell on the floor as he tried to smother the fire. Crystal told him to leave her alone, and she ran out of the bedroom.

Magee went into the living room and noticed that neither Crystal nor her family members were there. He said he was dazed due to the burns on his arms and face. He saw a man enter the smoky apartment, grab the children, and take them outside. Magee testified that he did not know how the fire started, but said that a number of appliances in the bathroom were plugged in. He estimated that only a few seconds passed from the time he and Crystal struggled over the gas can to the time she called to him from the bathroom. Magee denied pouring gasoline on Crystal and setting her on fire. When asked why Crystal would have told so many people that he had set her on fire, Magee stated that he and Crystal were on bad terms and he knew she was mad at him.

Magee testified that Crystal had tried to harm herself in 1992 by taking an "abundance" of pain pills. He had found her in the bathroom and "grabbed [her] by the throat and . . . snatched the pills out of her mouth." He suggested to Crystal that she get counseling and described her as "overly emotional."

Magee stated that he had received a psychiatric discharge from the military in 1993 after the death of his father. He was diagnosed with a "personality disorder, not otherwise antisocial, and histrionic features" by the evaluating psychiatrist. Magee conceded that the psychiatrist may have also determined that he was a "continuing risk to do harm to [himself] and to others."

Over objection,[3] Magee testified that he was a "rap" musician with the stage name

---

3. This testimony is considered in Issue 4. For the purposes of sufficiency points, we consid-

"Demize." His album was titled "Sex, Drugs and Guns, the American Way." The name of the album label was "Killer Instinct."

*Ben Taberia*

Ben Taberia, a maintenance man for the apartment complex, testified that on the day before the fire, Magee had run out of gas and he had gone with Magee to the store and purchased the gas can. He testified that Magee and Crystal did not have a violent relationship.

#### STATE'S REBUTTAL WITNESSES

*David Cawthorne*

Cawthorne was recalled and testified that, in his opinion based on the fire damage to the apartment, the fire had started on the bed and not in the bathroom. He stated that he had not tested the bed for gasoline and could not determine who had started the fire.

*John Sabra*

John Sabra, a surgeon at Parkland Hospital, testified that he had treated Magee in the emergency room for his injuries. Magee told Sabra that he and Crystal had had an argument and that "there was a can of gasoline nearby which somehow exploded."

## LEGAL SUFFICIENCY

■ Magee's first issue asserts that the evidence is legally insufficient to sustain his conviction. Evidence will sustain a conviction if, viewing it in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Lane v. State*, 933 S.W.2d 504, 507 (Tex.Crim.App.1996) (following standard of *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)).

The court's charge authorized the jury to convict Magee of murder if he (1) "knowingly and intentionally" set her on fire or (2) if, intending to cause serious bodily injury, he committed an act clearly dangerous to human life, *i.e.*, set her on fire, thereby causing her death. Magee argues that the State's case rests on Crystal's out-of-court statements which are inherently unreliable and on which he was unable to cross-examine.[4] He further argues that the State did not adequately rebut his defensive testimony regarding the fire.

In a "no-evidence" review, we look at all the evidence, direct and circumstantial, in the light most favorable to the jury's verdict. *Johnson v. State*, 967 S.W.2d 410, 411 (Tex.Crim.App.1998). Crystal told Turner, Minchew, Purdue, and Klein that her husband had thrown the gasoline on her and ignited the fire. She told Wallace that Magee had poured gasoline on her and "tried to kill her." The physical evidence, from the testimony of the firemen, paramedics, and doctors, is consistent with the verdict.

Viewing the evidence in the light most favorable to the verdict, we find that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* We overrule issue one.

## FACTUAL SUFFICIENCY

■ Magee's second issue asserts the evidence is factually insufficient to support the verdict. In conducting a factual sufficiency review, we consider the evidence without the prism of "in the light most favorable to the prosecution" and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v.*

---

er the evidence. *Johnson v. State,* 967 S.W.2d 410, 412 (Tex.Crim.App.1998).

**4.** The court determined that Crystal's declarations were admissible under a variety of ex-

ceptions to the hearsay rule. *See* TEX.R. EVID. 803, 804. Magee does not complain that Crystal's statements were inadmissible under the Rules of Evidence.

*State*, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). In performing a factual sufficiency review, we are required to give deference to the jury verdict and to examine all of the evidence impartially. *Cain v. State*, 958 S.W.2d 404, 410 (Tex.Crim.App.1997).

Magee argues that the evidence is factually insufficient because Crystal's out-of-court statements were unreliable and not subject to cross-examination,[5] he testified that he did not cause her death, Crystal had previously attempted suicide, and she was upset over the impending divorce.

Magee testified that after he and Crystal struggled with the gas can, she went into the bathroom. Within seconds she began screaming, and he ran to the bathroom to find her on fire. He denied pouring gasoline on her and igniting the fire.

Numerous witnesses testified that Crystal stated that Magee had poured gasoline on her and set her on fire. The medical testimony confirmed that Crystal had suffered third-degree burns over 95% of her body and that these injuries were consistent with gasoline burns. The fire inspector testified that, based on the fire damage to the apartment, the fire had started on the bed and not in the bathroom. Dr. Sabra testified that Magee told him the gas can had "exploded"—which conflicts both with the State's version of events and with Magee's own testimony that the two struggled over the can.

The weight to be given to contradictory testimony is within the "sole province of the jury." *Id.* at 408. After reviewing the evidence, we do not find that the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis*, 922 S.W.2d at 129. We overrule issue two.

5. As noted in footnote 4 under Issue One, the trial court determined that Crystal's declarations were admissible under a variety of exceptions to the hearsay rule. *See* Tex R. Evid. 803, 804.

## HEARSAY

◼ Magee's third issue complains that the court erred in admitting Crystal's statement to Dr. Purdue in the emergency room. The court conducted a hearing outside the jury's presence. Purdue testified that he determined Crystal was going to die from her injuries. After he determined that she was "alert and oriented," Purdue told Crystal that her injuries "were going to kill her." He discussed treatment options with her and then asked how she had been burned. Crystal told him that "her husband had thrown gasoline on her and ignited it."

Magee objected that the statement did not qualify as an excited utterance under Rule of Evidence 803(2).[6] Tex.R. Evid. 803(2). The court overruled the objection and noted that Crystal's statement was also admissible as a dying declaration under Rule 804(b)(2). *Id.* 804(b)(2). Magee objected to similar statements in the written medical records which were admitted as exhibits. Purdue then testified to the jury.

◼ A ruling on admissibility of an out-of-court statement under a hearsay exception is within the trial court's discretion, subject to review only for abuse. *Coffin v. State*, 885 S.W.2d 140, 149 (Tex.Crim.App. 1994). Magee concedes that the trial court has discretion in determining the admissibility of an out-of-court statement under the "excited utterance" hearsay exception. *See Lawton v. State*, 913 S.W.2d 542, 553 (Tex.Crim.App.1995). Magee argues that Crystal's statement was not an excited utterance because she made the statement around 2 p.m. at the hospital, and thus she was not under the stress of the event.

We uphold the trial court's decision "if it was correct under any theory of law applicable to the case, even if the trial court gave an incorrect reason for its decision."

6. At the time of trial, the former Rules of Criminal Evidence were in effect.

*Jones v. State,* 982 S.W.2d 386, 389 (Tex. Crim.App.1998). Here, the court considered Crystal's statement admissible as both an excited utterance and a dying declaration. A "dying declaration" is "a statement made by declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death." TEX.R. EVID. 804(b)(2). Purdue testified that he told Crystal she was going to die and gave her options for treatment. She chose to be made "comfortable." Purdue then asked how she had been burned, and Crystal answered.

We do not find that the court abused its discretion in determining Crystal's statement was admissible as a dying declaration. *See id; Coffin,* 885 S.W.2d at 149. We overrule issue three.

### "RAP" MUSICIAN EVIDENCE

■ In his fourth issue, Magee complains that the court erred in admitting testimony that he was a "rap" musician. During his direct examination, Magee testified about his job history. He had been in the military; had worked for Braum's, UPS, and Kraft; and had been working full-time as a porter for the Ridgegate Apartments. When the State asked about his "musical career," Magee asked for a bench conference. Outside the jury's presence, Magee stated that he was a rap musician with the stage name "Demize"; his record label was "Killer Instinct"; he was on an album titled "Sex, Drugs and Guns, The American Way"; and that detractors may refer to the music as "gangsta rap."

Magee objected that the line of questioning was irrelevant and prejudicial. The court stated: "Well, I do believe it's relevant, and I do believe that, you know, in a sense, the door has been opened. We've had a complete history of this man's work history. But I want to take a break at this time . . . ." The court took a break and returned to the bench:

The Court has taken a break. I have reviewed the testimony that the State wishes to introduce and I have weighed the probative value versus the prejudicial value. At this time I'll admit the testimony. I believe not to do so, having in front of this jury laid a complete military and work history, as well as family history, it would leave a false impression in front of the jury to be able to fully develop the personal traits of the Defendant and then leave this part of his personality out, so the Court will admit it.

Magee testified to the jury about his musical career.

■ Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. Rule 403 provides in part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." *Id.* 403; *Montgomery v. State,* 810 S.W.2d 372, 389 (Tex.Crim.App.1991) (on rehearing). Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial. *Montgomery,* 810 S.W.2d at 389. The court's determination under Rule 403 is reviewed by the abuse-of-discretion standard. *Id.* We may reverse only when the trial court's decision was outside the zone of reasonable disagreement. *Green v. State,* 934 S.W.2d 92, 104 (Tex.Crim.App.1996).

■ In reviewing the court's balancing-test determination, we reverse the trial court's judgment "rarely and only after a clear abuse of discretion." *Mozon v. State,* 991 S.W.2d 841, 846–47 (Tex.Crim.App. 1999) (citing *Montgomery,* 810 S.W.2d at 389). We cannot simply conclude, however, that "the trial judge did in fact conduct

the required balancing and did not rule arbitrarily or capriciously." *Id.* Rather, we measure the trial court's ruling against the relevant criteria by which a Rule 403 decision is made. *Id.* We must look at the proponent's need for the evidence in addition to determining the relevance of the evidence. *Id.* (citing *Montgomery,* 810 S.W.2d at 392–93). The relevant criteria in determining whether the prejudicial effect of relevant evidence outweighs its probative value include:

(1) how compellingly the evidence serves to make a fact of consequence more or less probable;

(2) the potential the other evidence has to impress the jury "in some irrational but nevertheless indelible way";

(3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense;

(4) the force of the proponent's need for this evidence to prove a fact of consequence, *i.e.,* does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*See id.* at 847 (citing *Santellan v. State,* 939 S.W.2d 155, 169 (Tex.Crim.App.1997)).[7]

Magee testified that he had been in the military and had worked several different jobs in Dallas. The State sought to question him on another aspect of his work history. The court determined this evidence to be relevant. The court then conducted the necessary balancing test and determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See Montgomery,* 810 S.W.2d at 389.

We believe the court correctly allowed testimony about Magee's work as a "rap" musician and that some people refer to such music as "gangsta rap." Magee had testified as to part of his work history, and the State was entitled to complete that

history. We believe, however, that the court erred in allowing testimony about the "labels" such as "Demize," "Killer Instinct," and "Sex, Drugs and Guns, The American Way." The inflammatory nature of these "labels" does not compellingly serve to make a fact of consequence more or less probable, and it had the potential to impress the jury in an "irrational" way. *See Mozon,* 991 S.W.2d at 847. Although the State spent a very brief time presenting this evidence, it had little need for the evidence to prove a fact of consequence. *Id.* We find that the unfair prejudicial effect of testimony about those "labels" substantially outweighed any probative value that such testimony might have had in this murder case. Tex.R. Evid. 403. Thus, we find the court erred in admitting the evidence. *Montgomery,* 810 S.W.2d at 389.

 Having found non-constitutional error, we must disregard it unless it affected a substantial right. Tex.R.App. P. 44.2(b); *Johnson v. State,* 967 S.W.2d 410, 416 (Tex.Crim.App.1998) (erroneous admission of hearsay statements reviewed as non-constitutional error). In applying the test for "harmless error" under Rule 44.2(b), our primary question is what effect the error had, or reasonably may have had, upon the jury's decision. *Fowler v. State,* 958 S.W.2d 853, 865 (Tex.App.— Waco 1997), *aff'd,* 991 S.W.2d 258 (Tex. Crim.App. 1999). We must view the error, not in isolation, but in relation to the entire proceeding. *Id.* We review the entire record to determine whether the error had more than a slight influence on the verdict. *Id.* at 866. If we find that it did, we must conclude that the error affected the defendant's rights in such a way as to require a new trial. *Id.* If we have grave doubts about its effect on the outcome, we should find that the error was such as to require a new trial. Otherwise, we should disregard the error.

---

**7.** Because Rule 403 applies to all relevant evidence and not just to evidence of extrane-ous offenses, we have adopted more general statements of the *Santellan* factors.

■ Some factors to consider when assessing harm in a Rule 403 error are: whether other evidence of the accused's guilt is substantial or overwhelming; whether and to what extent the State placed emphasis on the error; and whether other extraneous-conduct evidence reflecting poorly on the accused's character was properly admitted or admitted without objection. *Horton v. State*, 986 S.W.2d 297, 304 (Tex.App.—Waco 1999, no pet.).

■ After a thorough review of the evidence, we cannot say that the outcome of the trial would have been different without the "label" evidence. *Fowler*, 958 S.W.2d at 866. As summarized under the sufficiency points, the evidence clearly establishes Magee's guilt. Many witnesses testified that Crystal told them Magee had doused her with gasoline and ignited the fire. The physical evidence corroborated this testimony. The State briefly questioned Magee, eliciting testimony of the "labels," but did not later emphasize that testimony in closing argument. We do not find that the limited testimony as to the violent nature of the "labels" had more than a slight influence on the verdict. *See id.* We overrule issue four.

### BATSON CHALLENGE

■ In his fifth issue, Magee alleges the State impermissibly struck a juror based on race in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). After the parties had made their peremptory strikes, Magee objected that the State had struck Juror No. 7, E.L. Christian, a black male. During a discussion of whether Magee had made a prima facie showing of discrimination, the court noted that Christian had not properly completed his juror information card regarding where he had been born, his employment, or his length of residence. The State responded that it had struck

Christian in part because of the incomplete questionnaire. According to the State, Christian was inattentive and "too weak [and] quiet spoken" to be a good State's juror. The court denied the *Batson* motion.

Because the State offered a racially-neutral explanation and the court ruled on the ultimate issue of intentional discrimination, we need not address whether Magee met his initial burden to make a prima facie showing of discrimination. *Malone v. State*, 919 S.W.2d 410, 412 (Tex.Crim.App. 1996). The burden shifted to the State to come forward with a racially-neutral explanation for challenging Christian. *Chambers v. State*, 866 S.W.2d 9, 23 (Tex.Crim. App.1993); *see also* TEX.CODE CRIM. PROC. ANN. art. 35.261(a) (Vernon 1989). Once the State offered a racially-neutral explanation for the strike, the burden shifted back to Magee to show that the explanation was a sham or pretext. *Pondexter v. State*, 942 S.W.2d 577, 581 (Tex.Crim.App. 1996). The ultimate burden was on Magee to persuade the court that the allegations of prejudice were true. *Earhart v. State*, 823 S.W.2d 607, 624 (Tex.Crim.App.1991).

■ We review the record of the *Batson* hearing and the voir dire examination in the light most favorable to the trial court's ruling. *Adanandus v. State*, 866 S.W.2d 210, 223 (Tex.Crim.App.1993). We will not disturb a trial court's ruling on a *Batson* issue unless it is "clearly erroneous." *Id.* Although Magee asserted that the strike was motivated by race, the State gave two racially-neutral reasons for its strike: an incomplete juror information card and a "meek" and "quiet spoken" demeanor. Magee did not respond to the State's assertions, and thus did not show that those assertions were a sham or pretext. *Pondexter*, 942 S.W.2d at 581.[8] We do not find that Magee met the ultimate burden of proving that the State's strike

8. Ways to rebut the State's explanations include establishing disparate treatment of similar jurors and showing that the reasons do not relate to the facts of the case. *Cantu v.*

*State*, 842 S.W.2d 667, 688 (Tex.Crim.App. 1992); *Williams v. State*, 804 S.W.2d 95, 105–06 (Tex.Crim.App.1991).

was racially motivated. *See Earhart*, 823 S.W.2d at 624. We overrule issue five.

### DEADLY WEAPON FINDING

In his final issue, Magee argues that the evidence is insufficient to support the jury's deadly weapon finding. The indictment alleged that Magee "used and exhibited a deadly weapon, namely: gasoline and a flammable liquid the exact nature of which is unknown to the grand jurors, during the commission of this offense, a deadly weapon." During the punishment phase, the jury answered a special issue finding that Magee "used a deadly weapon, to wit: gasoline" in the commission of the offense.

A "deadly weapon" means:

(A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or

(B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

TEX. PEN.CODE ANN. § 1.07(a)(17) (Vernon 1994). Magee argues that gasoline is not a deadly weapon *per se* and that gasoline is not the type of deadly weapon the Legislature contemplated.

The Court of Criminal Appeals, interpreting what is now section 1.07(a)(17) of the Penal Code, stated that "[A]nything ... which is actually used to cause the death of a human being is a deadly weapon.... This is necessarily so because a thing which actually causes death is, by definition, 'capable of causing death.'" *Tyra v. State*, 897 S.W.2d 796, 798 (Tex. Crim.App.1995) (holding a motor vehicle can be a deadly weapon by the manner of its use).

Gasoline may be a deadly weapon in the manner of its use. *See Rogers v. State*, 908 S.W.2d 239, 242 (Tex.App.—El Paso 1995, no pet.); *Rice v. State*, 771 S.W.2d 599, 600 (Tex.App.—Houston [14th Dist.] 1989, no pet.). The evidence shows that Magee poured gasoline on Crystal and ignited her. The medical testimony established that her death was caused by the burns she suffered at Magee's hands.

We find the evidence sufficient to support the jury's finding that Magee used a deadly weapon in the commission of the offense. *See Hill v. State*, 913 S.W.2d 581, 583 (Tex.Crim.App.1996). We overrule issue six.

### CONCLUSION

Having overruled all the issues, we affirm the judgment.