

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-23-00016-CR
_____

WILLIAM FRANKLIN STAPP, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CR24202

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

# MEMORANDUM OPINION

A Wise County[1] jury convicted William Franklin Stapp of two counts of family violence assault.[2] Stapp appeals, claiming error in the trial court's admission of the victim's statements pursuant to the doctrine of forfeiture by wrongdoing, as well as error in the trial court's admission of evidence over Stapp's Rule 403 objections.[3] Because we find no error in the trial court's rulings, we affirm the trial court's judgments.

## I. Background

On April 3, 2021, Bridgeport police officer, Lieutenant Horace Langford, responded to a disturbance call at the apartment of Jordan, the complainant. Jordan, sobbing, had called 9-1-1. Her voice on the 9-1-1 recording is mostly unintelligible, but she can be understood to say, "[H]e beat the [expletive] out of me!" and then, "[H]e started strangling me." The 9-1-1 dispatch operator had difficulty understanding Jordan or getting her to answer questions. After one minute and twenty-five seconds, the call disconnected on Jordan's end. The 9-1-1 operator

---

[1]Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of the Second Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

[2]*See* TEX. PENAL CODE ANN. § 22.01 (Supp.). Both counts alleged that Stapp caused bodily injury to Tana Jordan, a person with whom Stapp had a dating relationship as defined by Section 71.0021(b) of the Texas Family Code. Count One alleged that Stapp assaulted Jordan by occlusion; Count Two alleged that he had previously been convicted of family violence assault, making both counts third-degree felonies. *See* TEX. PENAL CODE ANN. § 22.01(b)(2). The State further alleged, and the jury found, that Stapp used his hands as deadly weapons in both offenses. Stapp pled "true" to two enhancement allegations, *see* TEX. PENAL CODE ANN. § 12.42(d)), and was sentenced to forty-two years' imprisonment.

[3]*See* TEX. CODE CRIM. PROC. ANN. art. 38.49.

called the number back and was able to confirm Jordan's apartment number. Then Langford can be heard in the background talking to Jordan and trying to assess the situation and her condition.[4]

Langford testified that Jordan was "very incoherent," "was . . . sobbing, and was catatonic to some degree." Jordan told Langford that she "had been hit in the face. She described it as an MMA[5] style slap or a hit." She told Langford that Stapp, her ex-boyfriend, had come to her apartment without permission, they argued, and he slapped her, hit her in her face with a closed fist, threw her to the ground, choked her, and kicked her in the back. "Stapp was trying to tell [Jordan] to shut up and quit screaming, and he placed his hand over her mouth to silence her." Jordan told Langford that Stapp put his hands around her throat and squeezed "to the point that she couldn't breathe, and then took her phone away"; he then fled the apartment. Jordan "repeatedly" told Langford, "[H]e's eventually gonna kill me." She also told Langford "several times" that Stapp "broke [her] nose again." Jordan told Langford that "she had filed several other reports against Stapp for harassment in the past and that he had very violent tendencies."[6]

Three weeks after the assault, Jordan executed an affidavit of non-prosecution, indicating that she did not wish to participate in the prosecution of Stapp for the April 3 assault and preferred the charges to be dismissed.

---

[4]Langford testified that, when he arrived at Jordan's apartment, "she was sitting on the floor . . . up against the door, and [he] had to coax her into moving away from the door." When Langford entered, he found Jordan "laying in the floor . . . holding her face, holding her back, crying uncontrollably."

[5]Mixed martial arts.

[6]Langford observed and photographed injuries on Jordan consistent with her descriptions of the assault. In the apartment, Langford also saw signs of an assault—a pair of broken sunglasses, a watch, and overturned furniture.

The State also introduced evidence of another assault by Stapp a little more than a month earlier, where Stapp severely beat Jordan's friend, Jonathan Wright. Just before midnight, February 26, 2021, Bridgeport police responded to a disturbance call at Jordan's apartment. Jordan had called 9-1-1, and the first of two recordings from that night began with Jordan saying, apparently to Stapp, "No I don't. You need to go." She told the operator, "This isn't the first time I've had to call y'all. Now he's beating up my friend." Jordan answered the operator's request for her address and then began screaming, "Leave him alone! [Expletive,] he's beating him up! Someone please come!" Jordan apparently put the phone down because she can be heard yelling from a distance, "Get the [expletive] out of here. Get out of here!"

Jordan called 9-1-1 again, screaming for an ambulance, "He beat the [expletive] out of him. He's bleeding everywhere. Can I please have an ambulance?" The operator directed officers to respond.

A report sheet from emergency personnel responding to the February assault shows that the disturbance involved two men rolling around fighting on the ground. Jordan told responding police officers that Stapp started a fight with Wright, who officers found severely beaten, bleeding "profusely" from his badly broken nose.

## II.    Forfeiture by Wrongdoing

As mentioned above, Jordan executed an affidavit of non-prosecution about three weeks after the April 2021 assault. Although the State was able to serve Jordan with a subpoena a week before trial, it suspected Jordan would not appear at trial.

4

After voir dire and before trial began, the State sought to establish that, if Jordan did not appear for trial, it should be allowed to offer certain evidence based on the doctrine of forfeiture by wrongdoing. *See* TEX. CODE CRIM. PROC. ANN. art. 38.49.[7] The State presented the trial court with recordings of two conversations from the Wise County Jail.[8] The first was from a visitation on June 18, 2021. That conversation was between Stapp, Jordan, and Stapp's brother, Rubbin Stapp. They were visiting Stapp, who was incarcerated at the jail.

### A. The June 18, 2021, Recording

Among the topics discussed in the June 18 recording were the following:

- Stapp's brother told Jordan, "I know you're [unintelligible], but if you help [unintelligible], we'll help you";

- Stapp begged Jordan to help them, apparently meaning him and his brother and apparently referring to the charges against Stapp;

- Stapp told Jordan, "I'm not going to. I'm not going to, ever again. No drugs. I'm not even gonna drink anymore";

- Jordan asked Stapp what if he got released from jail and killed her, to which Stapp promised to stay away from her;

- Stapp told Jordan that he would be sent away for the rest of his life;

- Rubbin told Jordan, "I promise you, you will never have to worry about any kind of financial problems ever again";

---

[7]Generally, the statute precludes a "party to a criminal case" from "object[ing] to the admissibility of evidence" "based on the unavailability of [a] witness" where the actor "wrongfully procures" the witness's, or a prospective witness's, unavailability. TEX. CODE CRIM. PROC. ANN. art. 38.49(a). We examine the statute and its applications further in our discussion below.

[8]The State proffered two recordings of each conversation. For each conversation, the State presented a redacted copy, for presentation to the jury, and an unredacted version, for the trial court's consideration at the Article 38.49 hearing. We reviewed and analyzed the unredacted recordings of the two conversations for this analysis, as it appears the trial court listened to the unredacted versions in considering the State's request. The redacted versions presented to the jury were edited to omit any references to prior bad acts by Stapp.

- Stapp then told Jordan, "We'll take care of you baby, you know that." He also told her that he loved her;

- Jordan said, "I know what I'm gonna have to do, and it doesn't set well with my moral compass";

- Stapp apologized, as he did throughout the recording and promised Jordan she would never again be put in that position;

- Jordan told the brothers that they were getting old and that their mother must be rolling over in her grave over all the brothers' misdeeds; and

- Stapp told Jordan to "put that ring on [her] finger." She responded, "I don't have it," and Stapp replied, "Put that one on."[9]

Regarding the June 18 recording, the State stressed to the trial court the comment by Rubbin to Jordan that she would never have to worry about financial matters again and Stapp's prompt acquiescence—"We'll take care of you baby"—in support of its argument.

### B.      The September 7, 2022, Recording

The State produced a second recording, that of a phone call between Stapp and Jordan. The call was made on September 7, 2022, the day Jordan was served with a subpoena and one week before Stapp's trial. Jordan told Stapp that she and her boyfriend had gone to the district attorney's office that day to complain that police were harassing her son, who had just gotten his driver's license. She also told Stapp that her boyfriend told her that, despite having been subpoenaed, she did not have to appear at Stapp's trial.[10] Jordan told Stapp that she thought he had learned his lesson, and he agreed. Jordan and Stapp did discuss that Stapp's brother was

---

[9]There is no explanation in the record for this exchange.

[10]Jordan said her boyfriend told her, about the subpoena, that she did not have to appear and testify at Stapp's trial.

recently sentenced to forty-five years' imprisonment for an unstated crime. Stapp told Jordan that he "really would appreciate [her] help." A male voice, presumably Jordan's boyfriend, Billy, was next heard describing how he had urged Jordan not to appear at trial. Billy said, "If she don't [sic] show up in court, they don't have a case." Stapp responded, "They can't do it without her."

Billy then spoke directly to Stapp, saying that he told Jordan to say she did not know or remember anything about the case and that "no one deserve[d] to do twenty-five years for no [expletive] like that." Stapp thanked Billy, stating, "I appreciate your help, brother."

From the September 7 recording, the State argued that Stapp agreed with Billy's urging for Jordan not to appear at Stapp's trial.

The trial court said it felt "the key statements were probably made in the June 18th call," i.e., the comments that Jordan would be compensated financially. In sum, the trial court said it felt the recordings showed Stapp "was certainly trying to get [Jordan] not to testify against him." The court said that the evidence satisfied the preponderance standard for forfeiture by wrongdoing and ruled in the State's favor. In response, Stapp argued that the State had not established that he procured Jordan's absence under Article 38.49 and that the Fifth Circuit Court of Appeals had held that forfeiture by wrongdoing must be shown by clear and convincing evidence.

Over Stapp's objections, the trial court allowed the State to introduce the 9-1-1 calls from the February 2021 assault on Wright and the April 2021 assault on Jordan and the redacted conversations from the Wise County Jail.

7

C.	**Standard of Review**

"We review a trial court's decision to admit or exclude evidence for abuse of discretion." *Lund v. State*, 366 S.W.3d 848, 852 (Tex. App.—Texarkana 2012, pet. ref'd) (citing *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002)). A trial court abuses its discretion only when its decision "was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (quoting *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)); *Carter v. State*, 150 S.W.3d 230, 241 (Tex. App.—Texarkana 2004, no pet.). "If the trial court's decision to admit evidence is within the zone of reasonable disagreement, the trial court has not abused its discretion, and we must defer to that decision." *Lund*, 366 S.W.3d at 852 (citing *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)). "If there are no findings of fact, we review the evidence in the light most favorable to the court's ruling and assume the court made findings that are supported by the record." *Shepherd v. State*, 489 S.W.3d 559, 572–73 (Tex. App.—Texarkana 2016, pet. ref'd) (citing *Carmouche v. State*, 10 S.W.3d 323, 327–28 (Tex. Crim. App. 2000)). "[W]e may not substitute our own decision for that of the trial court." *Id.* at 573. We will uphold an evidentiary ruling "if it is correct on any theory of law that finds support in the record." *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006).

"Forfeiture by wrongdoing was originally a common law doctrine that permitted the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant." *Brown v. State*, 618 S.W.3d 352, 355 (Tex. Crim. App. 2021) (quoting *Giles v. California*, 554 U.S. 353, 359 (2008)). "We have held that this doctrine, if met,

exempts a statement from the restrictions of the Confrontation Clause." *Id.* (citing *Gonzalez*, 195

S.W.3d at 124–26). The Texas Code of Criminal Procedure purports to codify the doctrine and

provides, in relevant part:

> (a) A party to a criminal case who wrongfully procures the unavailability of a witness or prospective witness:
>
> > (1) may not benefit from the wrongdoing by depriving the trier of fact of relevant evidence and testimony; and
> >
> > (2) forfeits the party's right to object to the admissibility of evidence or statements based on the unavailability of the witness as provided by this article through forfeiture by wrongdoing.

TEX. CODE CRIM. PROC. ANN. art. 38.49(a).

"The Supreme Court has explained that the forfeiture rule applies only when the

defendant's conduct is '*designed* to prevent the witness from testifying.'" *Id.* (quoting *Giles*, 554

U.S. at 359). "The absence of a forfeiture rule covering this sort of conduct would create an

intolerable incentive for defendants to bribe, intimidate, or even kill witnesses against them.

There is nothing mysterious about courts' refusal to carry the rationale further." *Giles v.*

*California*, 554 U.S. 353, 365 (2008). *Giles* goes on to say,

> The notion that judges may strip the defendant of a right that the Constitution deems essential to a fair trial, on the basis of a prior *judicial* assessment that the defendant is guilty as charged, does not sit well with the right to trial by jury. It is akin, one might say, to "dispensing with jury trial because a defendant is obviously guilty."

*Id.* (quoting *Crawford v. Washington*, 541 U.S. 36, 62 (2004)). Forfeiture by wrongdoing must

be proved by a preponderance of the evidence. TEX. CODE CRIM. PROC. ANN. art. 38.49(c); *see*

*Brown*, 618 S.W.3d at 354.

9

### D. Analysis

In *Brown*, the alleged victim of a family-violence assault did not appear at trial despite being under subpoena.[11] *Brown*, 618 S.W.3d at 354. The trial court erroneously allowed the State to admit the alleged victim's out-of-court statements describing Brown's assault. *Id.* at 354. The State put on evidence that Brown lied to an investigator looking for the alleged victim and was found to be living with her at the time of trial. *Id.* at 358. "But without a murder, or some other offense that necessarily causes a victim's absence, there needs to be more than simply the past commission of family-violence assaults to show causation." *Id.* The State failed to demonstrate that actions by Brown caused the alleged victim not to testify. *Id.* at 359. The Texas Court of Criminal Appeals determined, "[A]ny conclusion that Appellant improperly influenced [the alleged victim] to not show up for court remains speculative." *Id.*

In *Gonzalez*, the defendant went into the home across the street from his family, shot and killed the two residents, and took their truck. *Gonzalez*, 195 S.W.3d at 115. One of the victims was alive when police arrived and was able to describe the murderer and say that he lived with or was associated with the people across the street. *Id.* Over Gonzalez's Confrontation Clause

---

[11]The alleged victim (the woman) told officers at the scene that Brown "had struck her repeatedly with a broom and had choked her," and the State proved that Brown "had previously been convicted of family-violence assault against" her. *Brown*, 618 S.W.3d at 353. In preparation for trial, the State's investigator went to the woman's last known address to serve her with a subpoena. *Id.* Brown answered the door and told the investigator that he and the woman were no longer together and that he did not know where she could be found, though "she was from Ohio or had family there." *Id.* The investigator looked up the woman's Facebook page and found a week-old posting suggesting that Brown and the woman were still romantically involved. *Id.* The investigator continued to look for the woman at the same residence, and, one day, she answered the door. *Id.* at 353–54. When the investigator told her that he had a subpoena for her, she slammed the door in his face. *Id.* The investigator "called out that [she] had been served with a subpoena[,] . . . that she had to 'be at court next Monday,'" and that he "was leaving the subpoena between the screen door and the front door," which he did and left. *Id.*

10

objections, the Court of Criminal Appeals upheld admission of the victim's statements to police because Gonzalez "forfeited his right to confront [her] by his own wrongful act." *Id.* at 126.

We addressed a forfeiture by wrongdoing scenario several years ago in *Shepherd.* Shepherd attempted to kidnap the mother of one of his children and shot and killed the mother. *Shepherd*, 489 S.W.3d at 563–64, 575. Because the "evidence support[ed] an inference that a part of the reason that Shepherd shot [the victim] was to prevent her from testifying against him," we concluded that "the trial court did not abuse its discretion in finding forfeiture by wrongdoing and admitting any testimonial hearsay statements of" the victim. *Id.* at 575.

In the case at bar, Stapp argues that there is no evidence he or anyone acting at his behest dissuaded Jordan from appearing at trial. Article 38.49 applies where "a party to a criminal case . . . wrongfully procures the unavailability of a witness." TEX. CODE CRIM. PROC. ANN. art. 38.49(a). As cited above, the United States Supreme Court has found that this rule applies where it is shown that "the defendant engaged in conduct *designed* to prevent the witness from testifying." *Giles*, 554 U.S. at 359. The State presented evidence that Stapp and his brother made comments suggesting they would financially provide for Jordan; Stapp implored Jordan to help him, a slightly more than roundabout suggestion that she not pursue the charges against him.

Stapp, in his brief, points to the fact that Jordan executed her affidavit of non-prosecution three weeks after the assaults and argues that she never changed her mind or position on that matter. But that is not dispositive. The question remains, did Stapp engage in conduct designed to prevent Jordan from testifying? In one recording, Jordan says that she knew "what [she was]

11

gonna have to do," and it did not "set well with her moral compass." In the two jail recordings, Stapp frequently apologized to Jordan, apparently for his assaults on her and for putting her in the position of being subpoenaed to testify in a felony trial. He asked for her help in dealing with the charges, which could be interpreted as asking for her help in evading accountability for those charges.

The evidence before the trial court supports a finding that Stapp encouraged Jordan not to appear to testify and acquiesced in his brother's offer of financial assistance if she did not participate in Stapp's trial. A preponderance of the evidence before the trial court showed that Stapp's conduct, and that of his brother, was designed to keep Jordan from testifying at trial. The trial court did not abuse his discretion in allowing the introduction of evidence under the doctrine of forfeiture by wrongdoing.

### E.    Any Error Was Harmless

Even if we were to conclude that the trial court erred to allow the challenged evidence under the doctrine of forfeiture by wrongdoing, any error was harmless. After arguing that the trial court erred to admit the various recordings under the doctrine of forfeiture by wrongdoing, Stapp's brief summarizes the State's evidence and points out that there was no eyewitness to the assaults for which he was convicted. "[A] conviction can be supported solely by circumstantial evidence." *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). Lieutenant Langford laid a sufficient predicate to establish that Jordan's statements to him, describing the assaults, were admissible as excited utterances. *See* TEX. R. EVID. 803(2); *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992) ("[T]he critical factor [in reviewing whether a

12

statement was an excited utterance] is whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event"). The 9-1-1 calls about the April 2021 assaults were admissible as nontestimonial statements describing criminal acts as or immediately after they happened.[12] *See Davis v. Washington*, 547 U.S. 813, 827–28 (2006). Also, the 9-1-1 calls and Langford's descriptions and photographs of her injuries supported Langford's testimony about Jordan's statements to him. Finally, the inculpatory statements Stapp made in the jail recordings—his frequent apologies to Jordan and promises to never engage in such conduct again—were statements against interest. *See* TEX. R. EVID. 803(24). Any error in the trial court's evidentiary ruling was harmless beyond a reasonable doubt.[13]

## III.     No Violation of Rule 403

Stapp claims in his second point of error that the trial court erred in admitting various testimony and evidence over Stapp's objection on Rule 403 grounds.[14] Stapp made no Rule 403 objections to some of these topics, and, thus, he has not preserved those claims for our review. On the preserved grounds, he fails to address all the factors in a Rule 403 analysis and does not demonstrate that the challenged evidence was substantially more prejudicial than probative. We will overrule this point of error.

---

[12]As discussed below, Stapp made no objections when police officers described the scene in February 2021 when they responded to Stapp's assault of Wright. That failure to object would have cured any error in the admission of the 9-1-1 calls from that night.

[13]Neither party addresses whether, if error occurred, it would be constitutional or nonconstitutional. *See* TEX. R. APP. P. 44.2. In an abundance of caution and because Stapp refers to the Sixth Amendment Confrontation Clause in his brief, we will assume for the sake of this case that any purported error would be constitutional. *See* U.S. CONST. amend. VI.

[14]"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403.

13

Stapp lists in his brief five areas of testimony that he claims should have been excluded by the trial court under Rule 403. Three of those are:

- "1 witness testified Ms. Jordan was very upset and had visible injuries on April 3, 2021";[15]

- "2 witnesses testified regarding a prior uncharged assault against Mr. Wright";[16] and

- "1 witness sponsored documents, including Mr. Stapp's statement."[17]

Stapp made no Rule 403 objections to those areas of testimony, and we will not consider this evidence in reviewing Stapp's Rule 403 point of error.[18]

This leaves two areas of evidence or testimony to support Stapp's appellate complaint under Rule 403, the admission of 9-1-1 call recordings from both the February and April assaults and redacted recordings of the conversations in the Wise County Jail, discussed above. He also

---

[15]From our reading of the record, Stapp seems to be referring to the testimony of Lieutenant Langford. Langford responded to the disturbance call that led to the instant prosecution. Langford described Jordan's demeanor, behavior, appearance, and statements on his arrival. He read, without objection, from a report from the paramedics that Jordan said her ex-boyfriend hit her in the face with his fist, threw her to the floor, put his knee on her back, and "grabbed her around the neck." When Stapp made a hearsay objection, the State elicited Langford's testimony describing Jordan as "very incoherent" and "crying uncontrollably, sobbing, and was catatonic to some degree." The State then offered Jordan's statements about the assault under the excited-utterance exception to the rule precluding hearsay testimony. *See* TEX. R. EVID. 803(2). Stapp did not challenge that theory of admissibility, and Langford continued to describe the scene at Jordan's apartment, relate her statements to him, and describe the injuries that he observed on her.

[16]This appears to refer to testimony from Bridgeport Police Officers Jerry Penny and Marissa Martinez, who testified to responding to a call at Jordan's apartment in February 2021, where they found Wright with a significantly broken nose with constant bleeding. The officer's descriptions of the scene and Wright's injuries, including photographs of him at the scene, were admitted without objection.

[17]Stapp's voluntary written statement to law enforcement was sponsored by the testimony of Investigator Greg Romine. That statement was made by Stapp a few days after the incident where he fought with Wright. When the State offered Stapp's written, non-custodial statement, Stapp announced, "No objections."

[18]*See* TEX. R. APP. P. 33.1(a).

14

complains of the State's expert witness, Licensed Professional Counselor Valerie Horn, who testified about the nature and circumstances of domestic violence.

### A. Standard of Review

When conducting a Rule 403 balancing test, the court

> must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). In any given case, "these factors may well blend together in practice." *Id.* at 642.

"Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Magee v. State*, 994 S.W.2d 878, 887 (Tex. App.—Waco 1999, pet. ref'd) (quoting *Montgomery v. State*, 810 S.W.2d 372, 389) (op. on reh'g)). "[*O*]*nly* if the danger of unfair prejudice substantially outweigh[s] the probative value of [the evidence]" will we find that the trial court abused its discretion in admitting the evidence. *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002) (emphasis added).

### B. Analysis

#### 1. Probative Force and State's Need for Evidence

The recordings of Stapp's conversations with Jordan were necessary to explain Jordan's absence from trial. Similarly, the testimony of Horn about the characteristics and circumstances of domestic violence victims further informed the jury why Jordan may not have appeared at

15

trial.  The 9-1-1 recordings of the April 2021 charged offense were necessary to demonstrate the urgency and danger of the situation while Stapp was assaulting Jordan, which led to the indictment and prosecution of Stapp.  Those 9-1-1 calls were also probative of the charged offenses.  The other 9-1-1 calls, regarding the event in February 2021 where Stapp beat Wright, were probative of Stapp's ability to use his hands as deadly weapons.  Those 9-1-1 calls were also probative of Jordan's fear of Stapp and of her reasons for not appearing at trial.

Those factors weigh in favor of admission.

### 2. Any Tendency to Suggest a Decision on an Improper Basis or to Confuse or Distract the Jury from the Main Issues at Trial

We cannot say the recordings at issue were likely to distract the jury or were likely to cause the jury to convict Stapp on any improper basis.  As explained above, the 9-1-1 recordings from the night of April 3, 2021, were relevant to the indicted offenses.  While the 9-1-1 calls from February 26, 2021, could be somewhat prejudicial in demonstrating Stapp's violent propensities, Stapp did not otherwise challenge testimony and evidence about the beating of Wright.  Jordan was present for that assault on Wright and could be heard telling Stapp he needed to leave.  This was probative of her relationship with Stapp.  Those factors weigh in favor of admission.

### 3. Time Spent Proving Extraneous-Offense Evidence Is Repetitive of Other Evidence Already Admitted

The audio recordings played at trial were of the following lengths:

- February 26, 2021, 9-1-1 call                                        0:42

- February 26, 2021, 9-1-1 call                                        1:09

16

- April 3, 2021, 9-1-1 call                                                  1:29

- April 3, 2021, 9-1-1 call (call back)                                       4:25[19]

- State Ex. 5 (June 18, 2021, jail visit)                                     2:40

- State Ex. 7 (Sept. 7, 2022, phone recording)                               3:01

Those recordings took just a little over thirteen minutes, total, to play before the jury. Over the course of a one-day presentation of guilt/innocence evidence, those recordings did not consume an unduly lengthy period of time and they were not cumulative of other evidence. Those factors weigh in favor of admission.

## IV.    Conclusion

In consideration of the *Gigliobianco* factors, we find no "clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)). The trial court was within its discretion to admit the challenged recordings. As a result, we overrule this point of error.

We affirm the trial court's judgment.


Jeff Rambin
Justice

Date Submitted:      June 26, 2023
Date Decided:        August 23, 2023

Do Not Publish

---

[19]Part of that recording includes Lieutenant Langford speaking to Jordan once he entered the apartment.