**James Anthony GRAFF, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–00–125–CR.**

Court of Appeals of Texas,
Waco.

Nov. 28, 2001.

Brian L. Gibson, Brian L. Gibson & Associates, P.L.L.C., Groesbeck, for appellant.

R. Neel McDonald, Freestone County Asst. County Atty., Fairfield, for appellee.

Before Chief Justice DAVIS, and Justices VANCE and GRAY.

## OPINION

TOM GRAY, Justice.

James Anthony Graff was convicted of attempted delivery of methamphetamine, a controlled substance, in an amount greater than four grams but less than 200 grams. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112 (Vernon Supp.2001). At punishment, Graff pled true to two prior felony convictions. The jury sentenced him to 80 years in prison. Raising three issues, Graff appeals. We affirm.

### BACKGROUND

In October of 1999, Captain Kelly Craig, of the Wortham Police Department, was contacted by a local Baptist minister to arrange a meeting with Roy Foley. Foley was a convicted felon with a drug problem and wanted to talk to Craig about turning his life around. The next day, Craig and

Detective Busby from the Limestone County Sheriff's Office met with Foley at a cemetery outside of town. They discussed Foley's problems, including the departure of his wife and his need to distance himself from the drug environment in which he lived. They also discussed Foley's association with Graff. Foley offered to arrange a drug buy from Graff.

Although Craig checked on Foley's story, he did not know that Foley had been living in Wilmer–Hutchins with Graff's sister. Foley testified at trial that he needed a place to stay for a couple of days. He stayed with Graff's sister about 4 to 5 weeks. Also, at trial, Foley acknowledged that he bought drugs from other people besides Graff. He did not want to give the names of those people. Although he stated he did not use drugs anymore, he admitted that he might have marijuana in his system.

Two days later, Craig met with Foley again. Craig told Foley to contact Graff and arrange a drug deal. Foley called Graff from a pay phone at about 11:30 a.m. Foley asked Graff for about one-half ounce of methamphetamine. The phone call was neither monitored by the police nor recorded. Craig searched Foley and then gave him $500 of prerecorded money. Foley said he expected to pay $600 to $625 for one-half ounce. When Craig told Foley he did not have more than $500, Foley said he would take care of the rest of the amount needed. Foley was not sure, but he may have told Graff that he would be short of cash and had a check from a local resident made out to him for $60 or $70 to help make up the difference.

Craig also thoroughly searched Foley's apartment. He did not go so far as to cut open any walls of the apartment. No drugs were found either on Foley or anywhere in his apartment. Craig shut off the water from the commode in Foley's apartment and flushed it several times so there would be no danger of having any drugs flushed. Craig and other officers set up surveillance of Foley's apartment and waited for about three hours for Graff to arrive. When Graff did not show, Craig arranged for the minister to pick up Foley and take him to the cemetery to meet with Craig. Craig asked Foley to contact Graff again to find out what time Graff would be in town. Foley complied and said Graff was in Ennis and would be there soon.

The officers returned to their original surveillance positions. Craig positioned himself one-half block to the north of Foley's residence. Two officers were a block south of the residence, and another officer was in the vacant apartment adjacent to Foley's apartment. Another officer sat in his vehicle at the north city limits of Wortham. No video surveillance was set up because the Wortham Police Department did not have that type of equipment. At about 4:55 p.m., an officer spotted a white Camaro entering the city. Craig then saw the Camaro park beside the apartment complex. Graff exited the passenger side of the car. He was wearing jeans and a t-shirt. He wore no coat and had nothing in his hands. As he approached Foley's apartment, Foley yelled for him to come in. Foley told Graff he did not have enough money for the amount of methamphetamine for which he had asked. Graff replied that he did not have exactly what Foley had asked for either.

At the time Graff entered the apartment, Craig radioed the other officers and told them it was time to go in after him. Craig had asked Foley to keep the transaction outside, but Foley said Graff would not take the drugs outside. The officers entered the apartment about 30 seconds to a minute after Graff. Reserve Sergeant Clayton Shivers entered the apartment first, followed by Detective Busby and

then Craig. Shivers saw Graff and Foley kneeling by an overturned bucket near the entrance of the hall. When the officers shouted, "Police. Get on the floor," Foley complied. Graff tried to run down the hall. Graff was able to take four or five steps before Shivers tackled Graff in the hallway just before the bathroom. And, as Shivers tackled Graff, he observed Graff throw something toward the bathroom. Shivers believed Graff was trying to get into the bathroom. Busby then handcuffed Graff while Shivers went back to handcuff Foley.

On the overturned bucket, the officers located an open packet of what later tested to be methamphetamine and a spoon. This packet weighed .32 grams. Foley stated the spoon was just for show. The $500 in prerecorded money was laying next to the bucket. Three more packets of methamphetamine and a plastic tube with a cap were found in the bathroom. Two of the packets were on the floor and one was in the sink. Individually, these packets weighed 15.11 grams, 1.65 grams, and .59 grams.

One of the officers searched Graff and located $279 in cash. His car, the Camaro, was also searched. In it, the officers located 147 boxes of cold and allergy pills, a black plastic bag with a hose, butane bottle connector, and a couple of small pipe fittings inside, and other various personal items, including a small amount of cash.

Craig took the drug packets seized from Foley's apartment to the Department of Public Safety lab in Waco to be tested. The substances tested positive for methamphetamine. After DPS tested the packets, Craig released them to R.T. Beck of the Limestone County Sheriff's Office for fingerprinting. No identifiable prints were located on the packets.

June, Graff's ex-wife, testified for the defense. They were married for 19½ years. They were divorced in 1992 due to Graff's drug problem. June helped the authorities with getting Graff convicted in the early '90's. She did not condone Graff's drug use and did not allow drugs in her home. On the day of the arrest, June, Graff, their daughter and granddaughter met at the Wal–Mart in Ennis. They discussed going to Mexia after their son-in-law got off of work. While shopping at Wal–Mart, Graff's phone rang. June did not overhear what the conversation was about because she was shopping. They shopped for 45 minutes. Graff asked June to drive his Camaro because he was tired. Graff stated he needed to stop in Wortham because Foley had been calling and Graff was going to cash a check for him. Graff was not wearing a coat, and June did not notice anything bulky in his pants pockets.

When they arrived at Wortham, June did not get out of the car. Graff said he would be right back. He did not take anything with him. June lost sight of Graff as he entered Foley's apartment. About a minute later, the police ran up to her, telling her to put up her hands. She was questioned and released.

Had she known Graff was going to make a drug deal, June said she would not have gone with him. Graff had been acting good in the last few years and she and the kids liked to see him every now and then. She had made it clear to him when they started seeing each other as friends, she and their kids would not see him again if he was involved with drugs. She did not think Graff would take the chance.

### COMMENT ON FAILURE TO TESTIFY

█ In his first issue, Graff contends the State committed fundamental error by commenting in voir dire on his failure to testify. At two different times during voir dire, the prosecutor referenced the defen-

dant's right not to testify. Specifically he stated:

> We're required to prove our case beyond a reasonable doubt. And if they choose not to present any testimony from any witness, then you're not to hold that against them. But, by the same token, neither are you to construe that somehow in their favor either. You just have to judge the case based on what evidence is presented to you from the witness chair.

\* \* \*

> I've told you before if the defendant fails to testify—if he elects not to testify, I don't know what they are going to do. If he elects not to testify, you can't hold it against him. You can't consider it in his favor either.

 When addressing a complaint of improper comments on a defendant's failure to testify, we review the language from the standpoint of the jury. *Goff v. State,* 931 S.W.2d 537, 548 (Tex.Crim.App.1996). The fact that the language might be construed as an implied or indirect allusion to a defendant's failure to testify is not sufficient. *Id.* Where the statement does not refer to evidence which can only come from the defendant, then it is not a direct comment on a defendant's failure to testify. *Id.* However, in voir dire, if the State has no way of knowing whether the defendant will testify, comments regarding whether or not the defendant will testify are not taken as comments on a subsequent failure of the defendant to testify and are not error. *See Campos v. State,* 589 S.W.2d 424, 426 (Tex.Crim.App.1979); *Silva v. State,* 989 S.W.2d 64, 67 (Tex.

App.—San Antonio 1998, pet. ref'd); *Sanders v. State,* 963 S.W.2d 184, 190 (Tex. App.—Corpus Christi 1998, pet. ref'd). A comment which occurs prior to the time testimony in the case has closed cannot be held to refer to a failure to testify which has not yet occurred. *Reynolds v. State,* 744 S.W.2d 156, 159–160 (Tex.App.— Amarillo 1987, pet. ref'd).

Here, the prosecutor's comments were only an attempt to instruct the jury on how to treat Graff's decision to not testify or to testify. They were not direct comments on Graff's failure to testify, especially since the record indicates that at the time of the comments, the prosecutor did not know whether or not Graff would testify. Graff's first issue is overruled.

### Extraneous Bad Acts

 In his second issue, Graff contends that the trial court erred in admitting the cold and allergy pills and the testimony about the potential use for these pills.[1]

During its case-in-chief, the State planned to call a DPS analyst to testify about the composition of the drugs seized, the method of the manufacture of the drugs and the relation of the seized pills with the manufacture of methamphetamine. Before the State called the analyst to the stand, Graff argued that there was no connection between the boxes of pills and the methamphetamine. He also argued that the purpose of the testimony was to inflame the jury and that its prejudicial effect would be overwhelming. The trial court decided to hear testimony from the analyst outside the presence of the jury.

---

1. The pills were separated into two exhibits: one with 107 boxes and one with 40 boxes. Earlier in the State's case, only the exhibit containing the 107 boxes was admitted into evidence. Graff voiced no objection to the introduction of the 107 boxes of pills. Therefore, we will confine our review of this issue to whether the trial court erred in admitting testimony regarding the potential use of the pills.

The analyst, Araceli Uptmor, testified that an initial screening test indicated the substances submitted by the police were methamphetamine. She conducted a mass spectrometer test to confirm the identity of the substances. The substances were confirmed to be methamphetamine. Some of the other ingredients found in the methamphetamine were triprolidine and ephedrine or pseudoephedrine. Ephedrine or pseudoephedrine is the active ingredient in the production of methamphetamine.

Uptmor was handed one of the boxes of pills that was already in evidence. She testified that those pills contained both triprolidine and pseudoephedrine. She agreed that those ingredients are used in the manufacture of methamphetamine by a particular method, the "Nazi" method. She explained that to produce methamphetamine, cold pills are crushed and the pseudoephedrine (or ephedrine) is extracted and combined with anhydrous ammonia and lithium to produce a "meth" oil. Uptmor concluded that cold pills containing pseudoephedrine or ephedrine and triprolidine were used in manufacturing the methamphetamine in evidence that had been found in the apartment. She did not, however, conduct any tests on the pills introduced by the State.

After Uptmor testified, Graff voiced an objection based on Rules 404(b) and 403 of the Rules of Evidence. The trial court found that the evidence was admissible under Rule 404(b) for the purpose of showing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or action. The court also found that pursuant to Rule 403 the probative value of the evidence outweighed any danger of unfair prejudice. Uptmor then gave essentially the same testimony before the jury.

## DEFENSE VS. PURPOSE

The basic defensive theory was that it was unreasonable to believe Graff could put all the drugs found in the apartment and the money and the drug paraphernalia in the pockets of his jeans.

For this particular case, the State had to establish Graff was in possession of the methamphetamine which was found in Foley's apartment and was attempting to deliver it. The relevance of the potential use of the boxes of pills was to establish an evidentiary fact, such as preparation, leading inferentially to the elemental fact that the methamphetamine found in the apartment was brought there by Graff. The basic theory being: the methamphetamine in the apartment was made by a certain process and contained certain trace elements; and the large quantity of cold tablets found in Graff's car if subjected to the particular process (the Nazi method) would yield methamphetamine with the same trace elements as the methamphetamine found in the apartment. Therefore, the theory continues, it is more probable that Graff was the person who had been in possession of the methamphetamine found in the apartment and had attempted to deliver it.

## APPLICABLE LAW

 The general rule is that an accused may not be tried for being a criminal generally. *Couret v. State*, 792 S.W.2d 106, 107 (Tex.Crim.App.1990); *Hankton v. State*, 23 S.W.3d 540, 545 (Tex.App.— Houston [1st Dist.] 2000, pet. ref'd). Evidence of other crimes, wrongs or acts are not admissible to prove the character of the defendant and that he acted in conformity with that character. Tex.R. Evid. 404(b); *Hankton*, 23 S.W.3d at 545. However, evidence may be admissible if it has relevance separate from the tendency to prove the defendant's character. Tex.R. Evid. 404(b); *Montgomery v. State*, 810

S.W.2d 372, 387 (Tex.Crim.App.1991) (op'n on rh'g).

■■■■■ If the trial court determines the evidence has relevance separate from character conformity, it is incumbent upon the opponent of the evidence to ask the trial court to exclude it under Rule 403 on the ground that the probative value of the evidence is nevertheless substantially outweighed by the danger of unfair prejudice. *Id.* at 389. Appellate courts measure the trial court's rulings concerning the admissibility of evidence of other crimes, wrongs, or acts under both Rules 404(b) and 403 by an abuse of discretion standard. *Id.* at 391; *Hankton*, 23 S.W.3d at 546. As long as the trial court's ruling was at least within the zone of reasonable disagreement, the appellate court will not interfere with the ruling. *Id.*

403 ANALYSIS

Graff argues on appeal that the probative value of the analyst's testimony was substantially outweighed by the danger of unfair prejudice. We must, therefore, decide whether the trial court abused its discretion in admitting the testimony over his Rule 403 objection.

*Law*

■■■■■ A presumption exists that relevant evidence is more probative than prejudicial. *Santellan v. State,* 939 S.W.2d 155, 169 (Tex.Crim.App.1997). Reviewing the trial court's judgment for abuse of discretion requires more than deciding that the court conducted the required balancing of probative value versus the danger of unfair prejudice and did not rule arbitrarily or capriciously. *Montgomery,* 810 S.W.2d at 392. The trial court's determination must be reasonable in view of all the relevant facts. *Santellan,* 939 S.W.2d at 169.

*Trial Court's Review*

■■■■■ A Rule 403 balancing test by the trial court includes the following factors:

1. how compellingly the extraneous evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

2. the potential the other evidence has to impress the jury "in some irrational but nevertheless indelible way;"

3. the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense;

4. the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*See Wyatt v. State,* 23 S.W.3d 18, 26 (Tex. Crim.App.2000); *Magee v. State,* 994 S.W.2d 878, 888 (Tex.App.—Waco 1999, pet. ref'd); *see also Montgomery,* 810 S.W.2d at 389–390.

*factor one-strength of evidence*

Is it more or less probable that someone attempted to deliver methamphetamine when the methamphetamine seized was made by a process which used the ingredients found in the 147 boxes of cold and allergy pills and contained the same trace elements? That these pills could be used to *manufacture* methamphetamine and that the drugs seized were made from ingredients found in the pills only marginally helps the State establish that Graff was in possession of the methamphetamine. But, it does provide circumstantial evidence that the methamphetamine in the apartment had been in Graff's possession.

*factor two-irrational, indelible impression*

The evidence that the pills could be used to manufacture methamphetamine had the potential to impress the jury in some irrational, yet indelible way. The jury could not help but be impacted by testimony that methamphetamine could be manufactured using the 147 boxes of cold pills found in Graff's car. This is especially so when the jury heard this evidence almost at the end of the State's case.

*factor three-time needed*

The State called five witnesses at the guilt/innocence phase of the trial. The State did not spend a significant amount of time in presenting the evidence. The time taken with the analyst did not exceed the time spent to develop the rest of the State's case-in-chief. The State took four times longer developing the offense with Craig than developing the evidence with the analyst.

*factor four-proponent's need*

The State did not need this evidence. There may be a time or case when this is the only type evidence to link a defendant with the particular substance or object; but in this case, there was enough circumstantial evidence to establish that Graff attempted to deliver the methamphetamine found in the apartment to Foley. The authorities simply interrupted before the actual delivery took place. Craig had searched Foley and his apartment thoroughly before Graff arrived. The integrity of the searched premises was not compromised after surveillance had commenced.

*Appellate Court's Review*

■ As the appellate court, we must measure the trial court's ruling against the relevant criteria by which a Rule 403 decision is to be made. *Montgomery,* 810 S.W.2d at 392. The four relevant criteria as identified by the Court of Criminal Appeals are: (1) that the fact at issue was not seriously contested; (2) that the State had other convincing evidence to establish the issue; (3) that the probative value of the evidence was not particularly compelling; and (4) that the evidence was of such a nature that a limiting instruction would not likely have been effective. *Reese v. State,* 33 S.W.3d 238, 241 (Tex.Crim.App.2000); *Montgomery,* 810 S.W.2d at 392 393.

■ When the record demonstrates one or more of the relevant criteria reasonably creating a risk that the probative value of the tendered evidence is substantially outweighed by the danger of unfair prejudice, then we should conclude that the trial court abused its discretion. *Reese,* 33S.W.3d at 241; *Montgomery,* 810 S.W.2d at 393. The trial court does not have the "right" to be "wrong" if that means admitting evidence which appears to be "substantially more prejudicial than probative." *Montgomery,* 810 S.W.2d at 393.

*evaluation of each criteria*

In this case, Graff did not mount a serious attack to the contested issue of the case, that being that he took the drugs into Foley's apartment to exchange for money. It was not unbelievable that someone could stuff four packets of methamphetamine, two items of drug paraphernalia, and $279 in cash in the pockets of a pair of jeans.

Next, the State had other convincing evidence to establish the issue. One packet of methamphetamine was on the bucket when police entered the residence. Graff was seen throwing something toward the bathroom when police tackled him. Three other packets of methamphetamine were found in the bathroom.

As we stated earlier, that the cold pills could be used to manufacture methamphetamine and that cold pills were used in the manufacture of the seized metham-

phetamine was not particularly compelling in obtaining a conviction, based on the facts of this case, for attempted delivery of methamphetamine.

Lastly, a limiting instruction could have assisted the jury in understanding the purposes for which the evidence was admitted and for which it could properly be considered. Such an instruction would not preclude the potential for unfairly prejudicing Graff; but we cannot say that a limiting instruction would not have been effective.

*Conclusion*

Three of the four relevant criteria are present. Because the presence of one or more of the above criteria reasonably leads to the conclusion that there is a risk that the probative value of the testimony was substantially outweighed by the danger of unfair prejudice, we find the trial court abused its discretion in admitting this testimony over Graff's Rule 403 objection.

HARM ANALYSIS

 Error in an evidentiary ruling is a non-constitutional error. *See Magee,* 994 S.W.2d at 888; *Armstead v. State,* 977 S.W.2d 791, 798 (Tex.App.—Fort Worth 1998, pet. ref'd). Therefore, we are to disregard the error unless it affected Graff's substantial rights. Tex.R.App. P. 44.2(b); Tex.R. Evid. 103(a). A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997). We review the record as a whole to determine whether the error had more than a slight influence on the verdict. *Morales v. State,* 32 S.W.3d 862, 867 (Tex.Crim.App. 2000); *Magee,* 994 S.W.2d at 888. If we find that it did, we must conclude that the error affected the defendant's rights in such a way as to require a new trial. *Magee,* 994 S.W.2d at 888.

 Some factors to consider when assessing harm in a Rule 403 error are: (1) whether other evidence of the accused's guilt is substantial or overwhelming; (2) whether and to what extent the State placed emphasis on the error; and (3) whether other extraneous evidence reflecting poorly on the accused's character was properly admitted or admitted without objection. *Id.* at 889; *Horton v. State,* 986 S.W.2d 297, 304 (Tex.App.—Waco 1999, no pet.).

*Application*

 As discussed earlier, the evidence of Graff's guilt was substantial without the testimony regarding the potential use of the cold pills. There was strong evidence to establish that all four packets of methamphetamine found in the apartment were brought there by Graff.

But, the State placed some emphasis on the evidence. The State presented the evidence about the potential use of the cold pills close to the end of its case-in-chief. After the analyst, the State presented only brief testimony by two witnesses before the State rested. In its close, the State stressed the amount of the cold pills discovered, that specific ingredients were found in the methamphetamine seized, and that the methamphetamine was made in a particular manner. The State also questioned who would have that bad of a cold to need all those pills. The jury, however, did not appear to place much emphasis on the cold pill evidence. Before reaching a verdict, the jury asked the court reporter to read back the testimony of where the remaining three packets of methamphetamine were found and what was seen thrown by Graff as he was tackled and in what direction it was thrown.

Finally, other evidence that reflected poorly on Graff's character at the guilt/innocence phase came from his ex-wife. She

testified that in the past, Graff had a drug problem and that she had helped to convict him in the early 1990's. At punishment, Graff pled true to two prior felony convictions. The jury also heard evidence that the amount of pseudoephedrine in the cold pills seized would cook down to three ounces of methamphetamine. We also note the jury heard that twenty-eight grams are contained in an ounce, and the average drug user would only use 1/4 gram at a time.[2] The State did not emphasize this testimony in argument on punishment.

After a review of the entire record in light of the factors discussed above, we cannot say that the error had more than a slight influence on the verdict of guilt or the level of punishment assessed. Specifically, we believe the evidence of guilt was so overwhelming that the improperly admitted evidence could not have had more than a slight influence on the verdict. Graff's second issue is overruled.

### INSUFFICIENCY OF THE EVIDENCE

In his final issue, Graff contends the evidence is both legally and factually insufficient to support his conviction.

### STANDARD OF REVIEW

A "legal sufficiency of the evidence review does not involve any weighing of favorable and non-favorable evidence." *Margraves v. State*, 34 S.W.3d 912, 917 (Tex.Crim.App.2000) (citing *Cardenas v. State*, 30 S.W.3d 384 (Tex. Crim.App.2000)). Instead, a legal sufficiency review calls upon the reviewing court to view the relevant evidence in the light most favorable to the verdict and determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.See also Jackson v. Virginia,*

443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *Mason v. State*, 905 S.W.2d 570, 574 (Tex.Crim.App. 1995).

When conducting a review of the factual sufficiency of the evidence, we begin with the assumption that the evidence is legally sufficient. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex.Crim.App. 1997). We then apply the standard of review set out by the Court of Criminal Appeals in *Johnson v. State*, 23 S.W.3d 1 (Tex.Crim.App.2000). We ask "whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the [fact finder's] determination, or the *proof of guilt*, although adequate if taken alone, is greatly outweighed by contrary proof." *Id.* at 11; *see also Cain v. State*, 958 S.W.2d 404 (Tex.Crim.App.1997); *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App.1996). The jury is the judge of the credibility of the witnesses and may "believe all, some, or none of the testimony." *Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim.App. 1991).

### APPLICATION

As stated earlier, Graff was convicted of attempted delivery of a controlled substance, methamphetamine. The elements of criminal attempt are:

(1) A person (requires proof of identity);

(2) commits an offense if;

(3) with specific intent;

(4) to commit an offense (here, delivery of methamphetamine);

(5) he does an act;

---

2. Graff does not ask us to decide the propriety of this punishment evidence, and we decline

to do so on our own initiative.

(6) amounting to more than mere preparation;

(7) that tends but fails;

(8) to effect the commission of the offense intended (here, delivery of methamphetamine).

TEX. PENAL CODE ANN. § 15.01(a) (Vernon 1994). For reference purposes only, the elements of delivery of a controlled substance are:

(1) A person (requires proof of identity);

(2) commits an offense if;

(3) he knowingly delivers;

(4) a controlled substance.

TEX. HEALTH & SAFETY CODE ANN. § 481.112(a) (Vernon Supp.2001).

■ Foley and his apartment were thoroughly searched before the proposed drug buy. The integrity of that search was not compromised. When the officers entered the property, Graff attempted to run, and as he was tackled, he threw what was later discovered to be three packets of methamphetamine toward the bathroom. Over four grams of methamphetamine were found in Foley's apartment. Thus, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Likewise, proof of guilt is not so obviously weak as to undermine confidence in the jury's determination and is not greatly outweighed by contrary proof. Graff's third issue is overruled.

### CONCLUSION

Having overruled each of Graff's issues on appeal, we affirm the judgment of the trial court.