In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00187-CR


______________________________




MONDREL JAQUIA WILSON, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 188th Judicial District Court


Gregg County, Texas


Trial Court No. 29680-A




 




Before Morriss, C.J., Ross and Carter, JJ.


Memorandum Opinion by Justice Ross



MEMORANDUM OPINION



 Mondrel Jaquia Wilson appeals from his conviction for aggravated robbery. A jury
convicted Wilson and assessed his punishment at fifty years' imprisonment and a
$10,000.00 fine. Wilson complains on appeal that, during voir dire, the prosecutor
impermissibly commented on his failure to testify.

 During voir dire of the venire, the prosecutor, Lance Larison, made the following
comments.

 Another right a defendant has in a criminal case is the right to remain
silent. He doesn't have to say anything. As the Judge told you, the burden
always stays with the State of Texas. But even if the defense chooses to put
on some evidence, the Defendant doesn't have to testify. There can be
several reasons why somebody may not want to testify. They may not make
a good witness for themselves. They may be guilty and they may not want
to tell you. They may have prior convictions and don't want to be impeached
with them. There can be several reasons why someone may not testify. But
whatever the reason, the twelve of you selected to sit in this Jury Box can't
hold that against him. And I know, growing up as an only child, that if
something went wrong, my dad called me up in front of him and asked me
about [sic]. If I was ever to have said, "Dad, I love you, but I'm going to
invoke my Fifth Amendment privilege," I think the beating would have begun
at that point, and I would have been presumed guilty. 


 But, in a criminal case, you can understand why we have that right. 
The State is the one who's accused him of doing wrong. There's no burden
on the defense. So, you cannot hold that against him. If he chooses not to
testify, you can't hold it against him. By the same token, if he takes that
witness stand, he's fair game. He's just like any other witness. He gets to
be impeached like any other witness, cross examined like any other witness. 
He doesn't get any brownie points for testifying.

 Counsel correctly points out that prosecutorial comment that refers to an accused's
failure to testify violates the accused's Fifth Amendment right against compelled
self-incrimination. See Griffin v. California, 380 U.S. 609 (1965); Bustamante v. State, 48
S.W.3d 761, 765 (Tex. Crim. App. 2001). The comment must clearly refer to the accused's
failure to testify, and it is not sufficient if it "might be construed as an implied or indirect
allusion." Bustamante, 48 S.W.3d at 765. The "test is whether the language used was
manifestly intended or was of such a character that the jury would necessarily and naturally
take it as a comment on the defendant's failure to testify." Id.; Canales v. State, 98 S.W.3d
690, 695 (Tex. Crim. App. 2003). Such a comment also violates a mandatory statute. Tex.
Code Crim. Proc. Ann. art. 38.08 (Vernon 1979).

 Counsel did not object to the prosecutor's commentary. In the absence of a timely
objection, the claim of error is not preserved for review. Tex. R. App. P. 33.1; see Broderick
v. State, 35 S.W.3d 67, 76 (Tex. App.-Texarkana 2000, pet. ref'd). 

 Further, the objectionable comments occurred during voir dire. Several courts have
held that a comment which occurs before testimony in a case has closed cannot be held
to refer to a failure to testify which has not yet occurred. Graff v. State, 65 S.W.3d 730,
737 (Tex. App.-Waco 2001, pet. ref'd); Silva v. State, 989 S.W.2d 64, 67 (Tex. App.-San
Antonio 1998, pet. ref'd); Reynolds v. State, 744 S.W.2d 156, 159-60 (Tex. App.-Amarillo
1987, pet. ref'd); see also McCarron v. State, 605 S.W.2d 589, 595 (Tex. Crim. App. [Panel
Op.] 1980). 

 Similarly, in Sanders v. State, 963 S.W.2d 184, 190 (Tex. App.-Corpus Christi 1998,
pet. ref'd), the prosecutor, during voir dire, presented the panel with hypothetical reasons
why a defendant might not want to testify (such as family loyalty, fear of drug dealers, or
that he or she was guilty). Even though Sanders did not preserve error in that case, the
court held that, because the statements were made during voir dire, there was no error-the
defendant had not yet invoked his right. Id.; see also Campos v. State, 589 S.W.2d 424,
426 (Tex. Crim. App. [Panel Op.] 1979) (holding because prosecutor had no way of
knowing whether defendant would in fact testify, no error committed by prosecution for
commenting during voir dire on defendant's failure to testify).

 The same analysis holds true in this case. At the time the prosecutor made the
comments, he could not know whether Wilson would testify; thus, his comments could not
have been made about the failure. We therefore conclude in this case that, even if the
claim had been preserved for review, reversible error has not been shown. 

 Further, the prosecutor opened his discussion by explaining how a defendant has
the right to remain silent and how the burden lies with the State. Here, the prosecutor's
comments were only an attempt to instruct the jury on how to treat Wilson's decision to
testify or not to testify. They were not direct comments on Wilson's failure to testify and
could not have been under the circumstances. See Graff, 65 S.W.3d at 737.


 We affirm the judgment.


 Donald R. Ross

 Justice


Date Submitted: September 17, 2003

Date Decided: September 18, 2003


Do Not Publish



s
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00089-CV
______________________________


RAM SITARAM AND TOM NAUG, Appellants
 
V.
 
AETNA U.S. HEALTHCARE OF NORTH TEXAS, INC.,
AND NYLCARE HEALTH PLAN, INC., Appellees


                                              

On Appeal from the 191st Judicial District Court
Dallas County, Texas
Trial Court No. 01-1642


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

          Ram Sitaram and Tom Naug (together, Sitaram


), independent insurance agents,
sued Aetna U.S. Healthcare of North Texas, Inc. (AUSHC) and NYLCare Health Plans, Inc.
(NYHPI) for breach of a settlement agreement. The trial court granted summary judgment
in favor of AUSHC and NYHPI, and Sitaram appeals. 
          A substantial number of corporate acquisitions by Aetna, Inc. (Aetna), and a
divestiture order, resulting from an antitrust action in federal court, led to questions of
whether Aetna or one of its subsidiaries became liable under a settlement agreement
entered into by Sitaram and Texas Sanus Health Plan, one of the purchased corporations. 
Ultimately, the issue is whether the summary judgment evidence raised a genuine issue
of material fact regarding whether one of Aetna's corporate entities was a "successor in
interest" under the settlement agreement at issue. Because the record does not reveal a
fact issue regarding whether one of Aetna's corporate entities assumed, either by statute
or express agreement, Sanus' (now NYLCare SW's) liabilities, we affirm the summary
judgment.
I.        FACTUAL AND PROCEDURAL HISTORY
A.       The GTE Contract and a Settlement Among the Parties (1989–1993)
          In 1989, Sitaram obtained GTE (now Verizon) as a client for Sanus. All parties
agree that, for approximately five years, Sanus paid Sitaram one percent of the gross
premiums paid by GTE for healthcare coverage.
          In 1993, Sanus ceased making payments to Sitaram. This caused a dispute
between Sitaram and Sanus, which was resolved through a settlement agreement that
same year. Sitaram's claims in the lawsuit underlying this appeal center on three
provisions of this 1993 Settlement: 
(1). . . . The obligations of this Agreement may not be avoided by
a change of name or location, sale or transfer of these [GTE] accounts to
any parent, subsidiary or affiliate. In the event of a sale, merger, or
acquisition of SANUS, this Agreement shall be binding upon the successor
in interest.

                     . . . .
 
(5)SANUS agrees to future payments equal to one percent (1%)
of the net premium received from GTE from October 1, 1993, until such time
as GTE is no longer a client of SANUS for all of the GTE divisions doing
business with SANUS as of October 1, 1993, . . . . 

                     . . . .
 
(13)It is understood and agreed that this Agreement shall be
binding upon and inure to the benefit of the parties hereto and their
respective heirs, representatives, successors, and assigns. 

At some point in the years between 1993 and 1998, Sanus became NYLCare SW. The
record does not delve into this transition, and it is not important to the central issue in this
appeal other than to identify the parties. Again, the parties do not dispute that NYLCare
SW (formerly Sanus) paid Sitaram pursuant to the 1993 Settlement through 1998.
B.       Aetna's Acquisition of NYHPI (including NYLCare SW) (1998)
          In 1998, Aetna and New York Life Insurance Company entered into an asset
purchase agreement (APA) whereby Aetna purchased NYHPI, the parent corporation of
NYLCare SW.


 Aetna thereby became the ultimate parent corporation of NYHPI and its
subsidiaries, including NYLCare SW. After the transaction was finalized, AUSHC and
NYLCare SW, competitors in the North Texas market before 1998, became sister affiliates,
and their relationship is the focus of this appeal.
          The terms of this purchase are set out in Article 2 of the APA. Sitaram focuses on
certain definitions and provisions in the APA between Aetna and New York Life. 
Specifically, they look to the definition of "excluded liabilities" as, among others, "all
Liabilities of [NYHPI] or any Subsidiary of [NYHPI] to the extent they do not arise out of or
relate to [NYHPI]." 
C.       AUSHC and NYLCare SW Relationship: Negotiations to "Renew" GTE
Contract (1998–1999)

          From March 1998 to June 1999, Sitaram continued to receive payments pursuant
to the 1993 Settlement. According to the summary judgment evidence, the process of
integrating certain functions of AUSHC and NYLCare SW began after the acquisition in the
spring of 1998. Functions such as marketing, sales, and certain administrative services
for NYLCare SW were coordinated with those of other Aetna affiliates, including sister
affiliate AUSHC. 
          In the spring of 1999, GTE began to solicit proposals from several Dallas area
health plans for its employee healthcare coverage for 2000. In May 1999, AUSHC
submitted a proposal to GTE. AUSHC and NYHPI concede NYLCare SW did not initially
submit a separate option to GTE. Instead, the AUSHC plan was "jointly presented to GTE
on behalf of AUSHC and NYLCare SW." Negotiations between AUSHC/NYLCare SW and
GTE then began. The record contains several hundred e-mail messages from within the
corporations regarding the "GTE Renewal Presentation."
D.       Antitrust Action and End of NYLCare SW and GTE Relationship (June– 
December 1999)

          In June 1999, this arguably collaborative effort between AUSHC and NYLCare SW
ended when a federal court ordered Aetna and its subsidiaries to divest itself of certain
Texas healthcare subsidiaries, NYLCare SW included.


 Pending the divestiture, Aetna was
ordered to hold out those subsidiaries as competing health plans. 
          It was only after the federal court order when NYLCare SW made a separate
proposal to GTE for employee healthcare coverage for the year 2000. Ultimately, GTE,
uncertain as to the future of NYLCare SW, rejected NYLCare SW's separate, later
proposal and instead chose to do business with AUSHC. GTE formally ceased doing
business with NYLCare SW in January 2000. 
          From the time the federal court issued its divestiture order until the completion of
the divestiture, NYLCare SW "continued to be held out as a competitor" of AUSHC in the
Dallas area. NYHPI sold NYLCare SW to Health Care Service Corporation in March 2000. 
E.       AUSHC's Business Relationship with GTE and Early Stages of Litigation

          GTE continued to do business with AUSHC until January 1, 2002.


 In February
2001, Sitaram filed suit against AUSHC for breach of the 1993 Settlement. Sitaram
alleged that AUSHC became a "successor in interest" under the terms of the 1993
Settlement and that AUSHC was liable to them under that agreement for premiums GTE
paid to AUSHC during the years 2000 and 2001. 
          AUSHC moved for summary judgment on the ground that Sitaram had sued the
wrong party. In response, Sitaram moved for leave to join five additional Aetna entities as
parties. In an effort to reduce the amount of discovery, the trial court ordered AUSHC to
stipulate as to the Aetna entity, if any, that would possibly be liable under Sitaram's theory
of recovery. AUSHC designated in writing that NYHPI is the only party against whom
Sitaram could pursue their claims:
To the extent that having at one time been the parent corporation of Sanus
[now NYLCare SW] creates any potential legal obligation against any Aetna
entity under [NYLCare SW's] agreement with Plaintiffs, which AUSHC
expressly denies, AUSHC stipulates that NYHPI is the only Aetna entity
against which Plaintiffs could pursue their claim.

F.       Sitaram's Claims and AUSHC's and NYHPI's Motions for Summary Judgment
          In its amended petition, Sitaram made the following allegations:
IV.
Alternatively, and without prejudice to the foregoing, Plaintiffs allege
that NYHPI is the successor in interest. Plaintiff[s] further allege[ ] that after
acquiring NYLCare [SW] that "NYHPI" assigned or gave the GTE account to
AUSHC. Plaintiff[s] allege[ ] that NYHPI directed and controlled the GTE
account after the acquisition of NYLCare [SW]. 

                     . . . .

VI.
In 1998, Sanus then doing business as NYLCare [SW], was sold to
Aetna. During the calendar year of 1999 Aetna . . . paid Plaintiffs pursuant
to the 1993 settlement agreement. Aetna was a successor in interest to
NYLCare [SW] f/d/b/a Sanus Texas Health Plan Inc. as that term is affirmed
in the settlement agreement.

AUSHC moved for summary judgment on the following two grounds:
A.AUSHC is neither a party to the [1993 Settlement] nor a successor-in-interest to the contracting party, and, therefore, is not bound by the
terms of the [1993 Settlement].
 
B.There has been no breach of the [1993 Settlement] because there
has been no obligation of payment since GTE terminated its business
relationship with NYLCare SW.

Similarly, NYHPI moved for summary judgment on the following two grounds:
1.NYHPI remained a separate corporation from NYLCare SW and, as
a matter of law, is not liable for any obligation of NYLCare SW under
the [1993 Settlement]; and
 
2.There is no breach of the [1993 Settlement] because there has been
no obligation of payment since GTE terminated its business
relationship with NYLCare SW.

The trial court granted summary judgment on both grounds as to both parties.


 Summary
judgment was expressly not granted on the ground that Sitaram had sued the wrong
corporate affiliate.
II.       ADDITIONAL STIPULATION ISSUE
          As noted, following AUSHC's motion for summary judgment based on the ground
that Sitaram had sued the wrong entity, Sitaram moved for leave to join five additional
parties. To avoid the delay and paperwork involved in such a joinder, the trial court
ordered AUSHC to stipulate as to which Aetna entity, if any, would be liable under
Sitaram's allegations. AUSHC designated NYHPI, NYLCare SW's former parent
corporation, as such entity. 
          Sitaram's counsel was perplexed by the designation of NYHPI as the potentially
liable party since NYHPI did not appear to be involved in this matter to such an extent. 
When he expressed his concern regarding NYHPI's role in this matter and his confusion
over AUSHC's identifying NYHPI as the potentially responsible party, opposing counsel
referred to the written stipulation: "He has the stipulation, Your Honor, and that's -- that's
better than reams of discovery." Then the following exchange occurred:
[Sitaram's Counsel]: I'll take them at their word then that that's -- that
if we prove it as -- if we prove [AUSHC] retains the account, then [NYHPI]
would be responsible for the payment of the commission.
 
THE COURT: Is that fair?
 
[AUSHC and NYHPI's Counsel]: As stipulated.
 
THE COURT: Okay. All right, fine.
 
[Sitaram's Counsel]: That works for me. 
It is this exchange from which Sitaram's counsel understood that a new stipulation was
reached.
A.       Composition of a Rule 11 Agreement
          Rule 11 provides that "[u]nless otherwise provided in these rules, no agreement
between attorneys or parties touching any suit pending will be enforced unless it be in
writing, signed and filed with the papers as part of the record, or unless it be made in open
court and entered of record." Tex. R. Civ. P. 11; London Mkt. Cos. v. Schattman, 811
S.W.2d 550, 552 (Tex. 1991).
          We must determine the intention of the parties in a trial stipulation from the
language used in the entire agreement "in the light of the surrounding circumstances,
including the state of the pleadings, the allegations therein, and the attitude of the parties
in respect of the issues." Herschbach v. City of Corpus Christi, 883 S.W.2d 720, 734 (Tex.
App.—Corpus Christi 1994, writ denied); Discovery Operating, Inc. v. Baskin, 855 S.W.2d
884, 886–87 (Tex. App.—El Paso 1993, orig. proceeding); Mann v. Fender, 587 S.W.2d
188, 202 (Tex. Civ. App.—Waco 1979, writ ref'd n.r.e.). The trial court should disregard
the stipulation if it is ambiguous and uncertain in its terms. Herschbach, 883 S.W.2d at
734. To have a binding, open-court stipulation, the parties must dictate into the record all
material terms. Id.
B.       The Record Does Not Clearly Demonstrate the Parties Agreed to an Additional
Stipulation

          The process by which AUSHC designated NYHPI as the party who would have been
liable is not entirely clear,


 and Sitaram's counsel believed the parties had agreed to a new,
clearer stipulation. However, the record does not support such a conclusion for two related
reasons: 1) the uncertainty of the alleged oral agreement and AUSHC's and NYHPI's
assent thereto, and 2) the circumstances surrounding the execution of the prior written
stipulation. See id.; Baskin, 855 S.W.2d at 887. 
          First, Sitaram's counsel's remarks concerning NYHPI did not thoroughly state the
terms of any stipulation. More importantly, AUSHC and NYHPI's counsel did not clearly
agree to the stipulation. AUSHC and NYHPI's counsel's remark, "As stipulated," appears
to be a reference to the earlier written stipulation, rather than an expression of agreement
to a new, oral stipulation. Based on this record, we cannot say the parties entered into a
new stipulation. See Herschbach, 883 S.W.2d at 734; Baskin, 855 S.W.2d at 887.
          Second, from the discussion surrounding the written stipulation, it is clear AUSHC
and NYHPI were entering into the original stipulation for the sole purpose of limiting
discovery and expressly rejected the notion the stipulation was an admission of liability. 
The trial court confirmed this purpose of the stipulation:
THE COURT: Well, I don't want to box them in. I want them to go
back and say -- make sure they understand what you're alleging, and then
say: We don't think any Aetna entity owes you a dime, but under what you're
alleging in your view of the world if we accepted that as true, it would be this
Aetna entity. That's all I'm trying to get to. And it will not be in any way an
admission of liability or anything by anyone. It's just going to get us past this
issue of trying to decide who we're suing.

          Based on these statements, we cannot agree with Sitaram's position that the
exchange at issue represented a stipulation that NYHPI would be liable if Sitaram showed
that any Aetna entity obtained the GTE account for the years 2000 and 2001. We
conclude the record does not clearly demonstrate that AUSHC and NYHPI agreed to this
additional, oral stipulation, which would effectively stipulate them out of court since, on
these facts, such a stipulation would serve as an admission of liability.
          The questioned exchange is uncertain in its terms and whether there was any
agreement at all, and the circumstances surrounding the alleged agreement undermine its
existence in that AUSHC and NYHPI clearly did not intend to admit liability in the matter. 
The trial court properly disregarded this alleged, additional agreement. We overrule
Sitaram's contention. 
III.      SUMMARY JUDGMENT
          Having concluded the parties did not enter into a Rule 11 agreement that NYHPI
was liable if the evidence showed any Aetna entity obtained the GTE contract, we must
now determine if the record contains a genuine issue of material fact concerning whether
AUSHC or NYHPI became a successor in interest pursuant to the 1998 APA between
Aetna and New York Life.
A.       Standard and Scope of Review
          We review the granting of a traditional motion for summary judgment de novo. 
Natividad v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994). We are only to determine
from the summary judgment evidence whether there is any genuine issue of material fact
to try. Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508, 510 (Tex. 1995). We accept
as true evidence favoring the nonmovant, indulging every reasonable inference and
resolving all doubts in the nonmovant's favor. Id.; Nixon v. Mr. Prop. Mgmt. Co., 690
S.W.2d 546, 548–49 (Tex. 1985). 
B.       Who Is and Is Not a "Successor in Interest"
          It is fundamental that a contract is not binding on a nonparty. See Bell Oil & Gas
Co. v. Allied Chem. Corp., 431 S.W.2d 336, 337, 341 (Tex. 1968). Therefore, in order for
the 1993 Settlement to have been in effect during the years 2000 and 2001, a successor
in interest was required because it is uncontroverted that GTE opted to not do business
with NYLCare SW as of January 1, 2000.
          We begin with the general presumption in Texas: Courts will recognize the separate
identities of corporations even when one corporation dominates or controls another, or
even treats the other corporation as a mere department, instrumentality, or agency of the
other. Pulaski Bank & Trust Co. v. Tex. Am. Bank/Fort Worth, N.A., 759 S.W.2d 723, 731
(Tex. App.—Dallas 1988, writ denied); Norton v. Integral Corp., 584 S.W.2d 932, 935 (Tex.
Civ. App.—Austin 1979, no writ). This presumption applies to a parent corporation and its
separate corporate subsidiary as well, presuming, again, they are distinct legal entities. 
BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 798 (Tex. 2002).
          The Texas Business Corporation Act governs the liability of an acquiring
corporation:
B.A disposition of any, all, or substantially all, of the property and
assets of a corporation, whether or not it requires the special authorization
of the shareholders of the corporation, effected under Section A of this article
. . . or otherwise:
 
(1)is not considered to be a merger or conversion pursuant to this
Act or otherwise; and
 
(2)except as otherwise expressly provided by another statute,
does not make the acquiring corporation . . . responsible or liable for any
liability or obligation of the selling corporation that the acquiring corporation
. . . did not expressly assume.

Tex. Bus. Corp. Act Ann. art. 5.10(B) (Vernon 2003); C.M. Asfahl Agency v. Tensor, Inc.,
135 S.W.3d 768, 778 (Tex. App.—Houston [1st Dist.] 2004, no pet.). In other words, the
purchase of all or substantially all of the property or assets of the seller corporation "does
not make the acquiring [entity] responsible or liable for any liability or obligation of the
selling corporation unless the acquiring entity expressly assumes the liability or obligation,
or unless another statute expressly provides to the contrary." Shapolsky v. Brewton, 56
S.W.3d 120, 137 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (emphasis added)
(citing Tex. Bus. Corp. Act Ann. art. 5.10(B)(2)). 
          When used as a legal term applying to corporations, the term "successor" has a
restricted meaning. See Farm & Home Sav. Ass'n v. Strauss, 671 S.W.2d 682, 685 (Tex.
App.—Dallas 1984, no writ). With respect to corporations, "successor" does not ordinarily
mean an assignee. Id. Rather, a "successor" is normally used in respect to corporate
entities to describe the status of a corporation which has become vested with the rights and
has assumed the burdens of another corporation by amalgamation, consolidation, or duly
authorized legal succession, and does not contemplate acquisition by ordinary purchase
from another corporation.


 Id.
C.       Neither AUSHC nor NYHPI Assumed the Obligation To Pay Per the 1993
Settlement

          To be successful in this appeal, Sitaram must show there is some fact issue
remaining regarding whether AUSHC (former sister corporation) or NYHPI (former direct
parent corporation) is a successor in interest to NYLCare SW.


 Even though the 1993
Settlement purported to bind "successors and assigns," such an agreement cannot
contravene the protections afforded Aetna by Article 5.10(B) when it purchased the assets
of NYHPI. See C.M. Asfahl Agency, 135 S.W.3d at 781. Under the law on these facts,
only two scenarios may result in the conclusion that Aetna assumed NYLCare SW's liability
under the 1993 Settlement: 1) a statute expressly provides that, on these facts, Aetna
became liable for the 1993 Settlement obligations, or 2) Aetna expressly assumed this
liability in the 1998 APA. Of course, because neither AUSHC nor NYHPI was a party to
the APA, we recognize that, even if Aetna assumed the obligation, another analytical step
would be required to determine whether AUSHC or NYHPI, both subsidiaries of Aetna,
would be liable for an obligation assumed by their parent corporation. 
1.       No Assumption Per Statute
          Sitaram does not point us to—and we have not found—any statutory authority which
expressly provides for assumption of liability under these facts. The record does reveal
significant evidence that AUSHC and NYLCare SW had begun to integrate many corporate
resources. Notably, there is also evidence Aetna paid Sitaram pursuant to the 1993
Settlement during 1999 when AUSHC and NYLCare SW were acting as sister
corporations. The record also contains a great deal of evidence that AUSHC and NYLCare
SW collaborated on the GTE renewal project and that AUSHC used NYLCare SW's
information and its status as an incumbent in good standing to negotiate a deal with GTE. 
There is evidence, too, that Aetna planned to (and arguably had begun to) integrate the
two corporations. Aetna executive Nathan Eudaly, II, stated that there were plans to
"convert all NYLCare [SW] paper" into Aetna paper, but those "plans were never carried
through" and AUSHC and NYLCare SW remained separate and distinct HMOs at all times. 
          In their response to AUSHC's motion for summary judgment, Sitaram asserted that
eleven of the 1999 monthly payments were made to them via electronic funds transfer from
Aetna. The summary judgment evidence lends some support to this assertion, providing
two check stubs from payments made by Aetna Services, Inc., based in Hartford,
Connecticut, and two remittance slips confirming deposit of funds via electronic transfer
by "Aetna." Other documentation on NYLCare SW's letterhead provides a listing of the
dates and amounts of each payment for 1999, but does not indicate the source of the
payments. Eudaly stated that, at some point, Aetna took over this function, but he
maintained that the payments "came from and on behalf of [NYLCare SW]." 
          Clearly, questions of fact are raised by the evidence of integration and the evidence
of the purchasing corporation paying Sitaram's commissions pursuant to the 1993
Settlement. These fact issues, however, are not material to the existence or application
of any statutory authority under which Aetna could be said to have assumed NYLCare
SW's liabilities. See Tex. Bus. Corp. Act Ann. art. 5.10(B). We are unable to find any
statutory authority which would allow such evidence to support a conclusion that the
acquiring corporation became a successor in interest. 
2.       No Express Assumption Per Agreement
          Second, under the APA between Aetna and New York Life,


 Aetna does not
expressly assume NYLCare SW's liabilities and obligations. Sitaram argues that the APA's
definition of "excluded liabilities" represents an express assumption by Aetna. To arrive
at this conclusion, Sitaram asks us to follow them on a series of conclusions.
          Their construction begins with a portion of the definition of "excluded liabilities": 
"Liabilities of [NYHPI] or any Subsidiary of [NYHPI] to the extent they do not arise out of
or relate to the NYL Health Care Business." They argue that whatever is not excluded in
this definition is included. Because the 1993 Settlement "arises out of or relates to the
NYL Health Care Business," then the liabilities under the 1993 Settlement are not
excluded. Rather, Sitaram contends this liability is an included liability. There are at least
three flaws in this conclusion.
          First, it conflicts with Article 5.10's language requiring express assumption. 
Sitaram's conclusion centers on the implied converse of the definition of "excluded
liabilities," rather than any express language indicating Aetna's intent to assume liability
under the 1993 Settlement.
          Second, the import of the entire lengthy definition of "excluded liabilities" appears
to address the liabilities of NYHPI or its subsidiaries, such as NYLCare SW, for which New
York Life would no longer be potentially liable as the parent corporation. 
          Finally, the only other reference to "excluded liabilities" in that portion of the APA
before us is not a reference to assumption of liability by Aetna. Rather, the term is used
with reference to what must be and need not be included on the "Preliminary Closing
Balance Sheet" to be provided on the closing of the purchase between Aetna and New
York Life. "Excluded liabilities," according to the APA, need not be included in this
documentation. It is a tenuous connection we would have to make to read this reference
as an assumption of liability by Aetna, and a far more tenuous connection to go so far as
reading this as an assumption of liability by nonparty subsidiaries AUSHC or NYHPI. 
Sitaram's usage of "excluded liabilities" stretches the use of this term in the APA beyond
what either party plainly intended. The record therefore does not reveal remaining genuine
issues of fact regarding whether, in the APA, Aetna expressly assumed NYLCare SW's
obligations to Sitaram. 
IV.      CONCLUSION 
          The parties agree that, in order for there to be any obligation under the 1993
Settlement, there must have been a successor in interest to the 1993 Settlement. As used
with respect to corporations, the term "successor" has a specialized meaning beyond
simple acquisition. Texas courts generally recognize the distinction among corporate
affiliates, even when one clearly dominates the other. In order for there to be a successor
in interest, Aetna was required to expressly assume the liabilities of NYHPI, or there must
be another statute which expressly provides for such assumption of liability on these facts. 
See Tex. Bus. Corp. Act Ann. art. 5.10(B); Shapolsky, 56 S.W.3d at 137. We have found
no such language in the 1998 APA and no such statutory authority.
          While we find some evidence giving rise to genuine issues of fact, these fact issues
have no bearing on the material issue here, i.e., whether AUSHC or NYHPI assumed
liability pursuant to either statutory provision or by agreement. Thus, we cannot conclude
that the record demonstrates a remaining genuine issue of material fact. 
          We overrule Sitaram's points of error and affirm the summary judgment.

                                                                

                                                                           Donald R. Ross
                                                                           Justice

Date Submitted:      November 12, 2004
Date Decided:         December 23, 2004